640 So.2d 1258 (1994)
WEST JEFFERSON LEVEE DISTRICT
v.
COAST QUALITY CONSTRUCTION CORPORATION.
WEST JEFFERSON LEVEE DISTRICT
v.
BAYOU DES FAMILLES DEVELOPMENT CORP.
v.
Betty Jane Perrin, Wife of/and Ronald J. ISAAC.
No. 93-C-1718.
Supreme Court of Louisiana.
May 23, 1994.
Rehearing Denied August 12, 1994.
Opinion Dissenting from Denial of Rehearing August 12, 1994.
*1263 Harry C. Stumpf, Owen J. Bordelon, Jr, Stumpf, Dugas, LeBlanc, Papale & Ripp, for applicant.
David C. Loeb, Lawrence E. Chehardy, Chehardy, Sherman, Ellis, Breslin & Murray; Peter J. Butler, Nancy A. Nungesser, Anne A. Boling, Edward A. Boling, Catherine M. Sheafor, Locke, Purnell, Rain & Harrell, for respondent.
Nancy A. Nungesser, Anne S. Almy, Catherine M. Sheafor, for U.S., amicus curiae.
John A. Dunlap, Frank A. Tessier, for Jefferson Business Council, Harvey Canal Industry Association, Westbank Council Chamber, Chamber-New Orleans, Chamber-River Region, amicus curiae.
KIMBALL, Justice.[*]

I. ISSUE
The issue to be decided in this case is the amount of compensation due landowners as a result of the West Jefferson Levee District's expropriation of their property, where, at the time of the expropriation, almost all of the property expropriated was designated as wetlands under the federal Clean Water Act. In this case, the compensation due landowners turns primarily on the fair market value of the property expropriated at the time the District deposited its estimated valuation into the registry of the court in accordance with La.R.S. 38:387. Based on an exhaustive and thorough review of the entire record and on an assessment of the applicable law, we find the lower courts erred in their award of compensation, and we accordingly reverse the lower court judgments and remand the case for a redetermination, consistent with this opinion, of compensation due the landowners.

*1264 II. FACTS
In 1965, various federal, state, and local entities began to study the feasibility of building a jointly funded levee to protect the West Bank of Jefferson Parish from hurricane flooding.
On August 21, 1972, Bayou Des Families Development Corporation (BDF) purchased 2182.61 acres on the West Bank in the general area under consideration for construction of the hurricane protection levee. It appears that BDF paid $7,161,200 for the land.[1] A month prior to the purchase, the United States Army Corps of Engineers (Corps) had issued an announcement that a public meeting would be held to discuss the possibility of federal funding for the hurricane levee project. In the notice, the Corps proposed a levee alignment which would have placed BDF's land on the protected side of the hurricane levee.
Immediately after its purchase of the property, BDF sold 101 acres each to Charalex Lands Inc., which later became Coast Quality Construction Company, to Mr. and Mrs. Ronald J. Isaac, and to Regent Development Corporation.[2] It appears these landowners, who were also principals of BDF, each paid BDF $505,000 for their respective purchases.[3] All landowners agreed at that time BDF was to construct improvements on its property which would have benefitted the other landowners' parcels. These improvements were to include a levee which would have protected the land from flooding. While these transactions were taking place, Congress in August of 1972 ordered a study on the feasibility of the creation of a federal park in the vicinity of the landowners' property.
On October 18, 1972, Congress passed the Federal Water Pollution Control Act Amendments (FWPCA). 33 U.S.C. § 1251 et seq. The amendments, renamed the Clean Water Act in 1977, gave the Corps of Engineers the regulatory power to prohibit the discharge of pollutants into navigable waters except as authorized by permit, commonly known as the "section 404 permit." Likewise, under the Rivers and Harbors Appropriations Act of 1899 (RHA), 33 U.S.C. § 403, the Corps also has the regulatory power to prohibit any activity affecting any navigable waterway unless authorized by a "section 10" permit issued by the Corps.[4]
After purchase of the property, BDF hired VTN Corporation to develop a plan for the development of landowners' property into residential subdivisions. VTN's master plan was completed on February 12, 1973. In July of 1973, BDF entered into a contract for the construction of a pumping station and sewage treatment plant. In August of 1973, BDF entered into a contract for the construction of a levee to be located along the Corps' June 1972 recommended alignment such that the landowners' property would be on the protected side of the levee.
On January 15, 1974, the Corps of Engineers issued a cease and desist order to BDF prohibiting further development of, dredging, and filling on their land without the § 404 and § 10 permits necessary under the FWPCA and the RHA.[5] At the time of the issuance of the cease and desist order, the levee was approximately 75% to 90% complete. On March 8, 1974, the Corps ordered BDF to submit an after-the-fact permit application for the work already done and for the work necessary to complete the development *1265 of the land. The Jefferson Parish Council passed a resolution urging the Corps to grant BDF's permit application.
In April of 1975, BDF submitted an Environmental Impact Statement and an after-the-fact application for § 404 and § 10 permits for construction of its levee and development of its property. The permits would have allowed BDF to complete construction of the levee it had been building which would have enclosed and protected the landowners' land from flooding, thereby allowing it to be developed.[6] The application was complete and ready to be processed by the Corps by December of 1975.[7]
During the pendency of BDF's application for a permit to build its own levee necessary to protect its property from hurricanes, and prior to the Corps' action thereon, several events took place concerning the West Bank hurricane levee project and the proposed federal park. On May 16, 1978, the Jefferson Parish Coastal Zone Advisory Committee advised the Parish Council that the West Bank hurricane levee, once built, would form the growth conservation line for development of the parish. On May 17, 1978, the Corps of Engineers made a presentation to the Jefferson Parish Council regarding the various alignments under consideration for the construction of the West Bank hurricane protection levee. One of these alignments followed the levee alignment for which BDF was seeking a permit to build its own levee.
On November 10, 1978, Congress authorized the creation of Jean Lafitte National Park. 16 U.S.C. § 230, et seq. Section 230 states the park shall include:
(1) the area of approximately twenty thousand acres generally depicted on the map entitled "Barataria Marsh UnitJean Lafitte National Historical Park and Preserve" numbered 90,000B and dated April 1978, which shall be on file and available for public inspection in the office of the National Park Service, Department of the Interior.[8]
The 20,000 acres were divided into an 8,600 acre "core area" and an 11,400 acre "park protection zone." The boundaries of these areas were established in the enabling legislation and could only be revised by the Secretary of the Department of the Interior with the consent of Jefferson Parish. 16 U.S.C. §§ 230, 230a(a), 230a(b), 230a(f).[9]
The Secretary of the Department of the Interior is authorized to acquire the acreage in the core area. 16 U.S.C. § 230a(a). With regard to the park protection zone, the uses of land in the zone are to be regulated by local authorities pursuant to guidelines developed by the Secretary of the Interior in consultation with the local authorities. These regulations must serve to preserve certain values in the core area.[10] 16 U.S.C. *1266 § 230a(b) and (c). While the Secretary can acquire property in the core area in all cases, he can only acquire property in the park protection zone where the protective regulations were either not passed by or enforced by the local authorities and where such acquisition is necessary to protect (1) the fresh water drainage from the park protection zone into the core area, or (2) the vegetative cover in, the integrity of ecological and biological systems in, or the water and air quality of the core area. 16 U.S.C. § 230a(c) and (e).
The landowners herein introduced into evidence a copy of the park boundary map (# 90,000B) referred to in 16 U.S.C. § 230. Superimposed upon the park protection zone as depicted in the map is the landowners' appraiser's sketch of landowners' property involved in the dispute herein. The vast majority of landowners' property is located within the boundaries of the park protection zone.
On September 21, 1979, the Corps finally acted on and denied BDF's application for an after-the-fact permit to construct a levee to protect its property. On November 2, 1979, BDF sued the Corps, the Department of the Interior, and the United States of America in federal district court, seeking to enjoin the Corps' denial of its permit application, to enjoin the Corps from recommending for its own hurricane protection levee an alignment other than one following BDF's alignment, to enjoin the Department of the Interior from issuing regulations restricting land use in the park protection zone, and to enjoin the Department of the Interior from including a portion of BDF's property in the core area without being required to purchase it. The federal district court held: (1) the Corps had jurisdiction over the navigable waters and wetlands on BDF's property; (2) BDF's failure to obtain permits for construction of the levee and canal system constituted a violation of federal law; (3) the denial of the BDF permit application was not arbitrary or capricious; (4) the six month deadline on developing guidelines for the park protection zone is not mandatory; (5) BDF's exclusive remedy for claims of uncompensated takings by the federal government rests with the Court of Claims under the Tucker Act, 28 U.S.C. § 1491; and (6) it could not order the Corps to build its own hurricane protection levee along BDF's incomplete levee alignment because Congress decides whether and where to fund a flood control project and because the Corps, in choosing a levee other than BDF's levee alignment for its federal hurricane protection levee, was not ignoring the policy expressed in the Flood Control Act but merely also considering the Congressional intent expressed by the establishment of Jean Lafitte Park.[11] The Fifth Circuit Court of Appeals later affirmed this judgment, 709 F.2d 713 (5th Cir.1983), and the United States Supreme Court denied certiorari, 465 U.S. 1065, 104 S.Ct. 1413, 79 L.Ed.2d 739 (1984).
Because of the delay in obtaining federal assistance for funding of the West Bank hurricane *1267 levee project, the Jefferson Parish Council applied for a permit to build its own locally funded hurricane levee on June 19, 1981. The application sought a permit to construct a levee alignment generally along the alignment of BDF's partially completed levee, which was the same alignment BDF had previously applied for itself and which application had been denied by the Corps in 1979. In a November 20, 1980 letter to the Parish Council, the District Engineer of the Corps wrote that such a permit application would probably be denied because that alignment encompassed too much wetlands on the protected side of the levee.
In early 1981, the president of the Parish Council wrote a letter to BDF requesting the landowners donate the land necessary for the parish to build its levee along the alignment for which it had applied for a permit. No party disputes the landowners herein agreed to donate to the parish the lands necessary for the construction of a levee by the parish generally along BDF's incomplete levee alignment.
In February of 1984, the Corps issued a draft EIS in preparation for its decision on the parish's permit application. Although the parish requested a permit to construct a levee along BDF's levee alignment, the EIS proposed and considered seven different alignments. These alignments were chosen by the Corps. Alternative D [hereinafter alternative D or alignment D] was basically the original BDF alignment while Modified Alternative E [hereinafter Alternative E or Alignment E] generally followed the wetlands/non-wetlands interface and the boundary of the park protection zone. In the reaches affecting landowners' property, there were only two alternatives, alignments D and E.
At a public hearing on the parish's permit application held in April of 1984, the landowners, through Dr. Sherwood Gagliano, presented a compromise alignment which would run between Alternatives D and E. The landowners agreed to donate the land necessary for the construction of a levee on the compromise alignment. The Parish Council later passed a resolution approving of the compromise alignment and recommending it to the Corps for its consideration.
On June 18, 1984, the Corps, noting the parish had requested that it consider the compromise alignment, denied the parish's permit application. The Corps instead offered the parish a permit application for the construction of a levee along Modified Alternative E, which generally follows the wetlands/non-wetlands interface and the boundary of the park protection zone. The Parish Council continued to urge the Corps to accept the compromise alignment or alignment D. The landowners told the Council they would not donate the land necessary for the construction of a levee along alignment E and that the purchase price for the land would be $25,000,000.00. In a resolution it passed on June 21, 1984, the council informed the Corps it did not have the funds to purchase a right-of-way along Alternative E and that Alternative D or the compromise alignment should be the alignment offered by the Corps because the landowners were willing to donate the property necessary for these alignments.
In 1985, after a near-miss by Hurricane Juan, the Parish Council reluctantly passed a resolution accepting a permit for the construction of a levee along Alternative E and notifying the Corps that the West Jefferson Levee District should be the recipient of the permit. The District formally received the permit on February 25, 1986.
In the meantime, the federal government again became interested in providing federal funding assistance for a hurricane levee to protect the West Bank. In 1986 Congress authorized federal funding for the study and construction of a partially federally funded hurricane protection levee. In response, the Corps, in December of 1986, issued a Feasibility Report and a final EIS on the feasibility and location of a partially federally funded levee, and on April 20, 1987, authorized the project for funding.[12]
*1268 Because the federal funding was still not available for its levee project, the District in mid-1988 made amicable demands of the landowners for the property necessary to build a levee along alignment E. These demands were rejected. As a result, the District filed expropriation suits seeking 123.44 acres from BDF (on February 17, 1989), 44.96 acres from the Isaacs (on June 30, 1989), and 24.394 acres from Coast Quality Construction Corporation (on July 12, 1989). The District deposited $213,206.00, $24,726.00, and $13,058.00, respectively, into the registry of the court.[13] Orders of expropriation were issued in each suit. The landowners filed answers and reconventional demands seeking additional compensation for the expropriated land as well as severance damages, damages for delay in expropriating the property, and attorney's fees. In their answers, the three groups of landowners asserted "[t]he major factor utilized by the Corps and the District in determination of the location of the Project is the Jean Lafitte National Park and its Park Protection Zone." Their reconventional demands additionally alleged in part:
XVIII. The [landowners' property] is in the area intended to be covered by the PPZ and for that reason the Corps denied the BDF permit application on September 21, 1979.
....
XXI. [T]he Corps and the District failed to finally select an alignment until March, 1988 because of the disagreement between land owners and the advocates of the Park. The Parish and the property owners supported the western alignments [alignment D] to allow for additional development and lower right-of-way acquisitions costs, while the advocates of the Park demanded a more restrictive alignment to the east to include as much property as possible in the PPZ.
....
XXII. The demands of the parish and the property owners were ignored and the Corps selected the most easterly alignment, thereby including as much property as possible within the Park and its PPZ.[14]
The suits were consolidated.
In the meantime, after the District's acceptance of a permit to build its own locally funded hurricane levee along alignment E and after the District had filed these expropriation suits, the District and the Corps, on December 18, 1990, signed a Local Cooperating Agreement wherein the Corps agreed to share with the District the costs of constructing a West Bank hurricane protection levee which would be a more extensive levee than the one which the District was seeking to build on its own.
On July 25, 1991, the landowners filed suit against the United States of America in the U.S. Court of Claims, alleging the federal government has made uncompensated takings of their property, basically alleging the same allegations made herein, although asserting the federal government is liable for compensation for such actions.[15]
III. LOWER COURT JUDGMENTS

A. Trial Court
After a six day judge trial held in September of 1991, the trial judge rendered judgment on February 27, 1992 in favor of the landowners. The trial judge found all of the land should be valued as "developable" at the time of the taking, despite its nonpermitted wetland status, based on either of two theories: (1) even if the property was "devalued" at the time of the taking, the devaluation *1269 was caused by the hurricane levee project; thus the value of the property at the time of the expropriation should not include this devaluation; or (2) the land was actually developable at the time of the expropriation because there was no legal impediment to its development at that time. Accordingly, the trial judge awarded $2,849,000.00 to BDF, $1,480,000.00 to Coast Quality, and $975,000.00 to the Isaacs for compensation for the land actually expropriated by the District for the construction of the levee.
Regarding severance damages, the trial judge also found the placement of a levee along alignment E rendered previously "developable" land now located on the unprotected side of the levee undevelopable. Therefore, he also awarded the landowners severance damages in the amounts of $14,478,000.00 to BDF, $703,000.00 to Coast Quality, and $1,194,000.00 to the Isaacs.
Finding the levee alignment selection process had been "long and controversial" such that the landowners had suffered a "substantial delay," the trial judge also awarded "delay damages" at the rate of 10% per year from September 21, 1979, the date BDF's permit application was denied, calculated on the value the various properties had on that date. The judge therefore awarded $15,642,664.00 to BDF, $1,685,935.00 to Coast Quality, and $1,654,145.00 to the Isaacs for "delay damages."
Pursuant to La.R.S. 38:387(E), the trial judge also awarded attorney's fees in the amount of 25% of the difference between the amounts deposited into the registry of the court and the amounts he awarded in the judgment. This amounted to $8,189,114.00 to BDF, $963,969.00 to Coast Quality, and $949,605.00 to the Isaacs.[16]

B. Court of Appeal
The District appealed to the fifth circuit court of appeal. The court of appeal affirmed the amount of damages awarded for the land expropriated and the amount given for severance damages.[17] The court first held the expropriation suits filed in 1989 by the District destroyed the market value of the land and "[u]ntil then, the real possibility of a change in the landowners favor existed.... [T]he Levee District took action which forever foreclosed the possibility of development." West Jefferson, supra, 620 So.2d at 333. The court then held that even if it were to agree the land had only nominal wetland value, it would still hold the District liable for a value based on the assumption the land was developable,
because the inability to get a permit or develop the land prior to the takings was wholly the result of governmental (all of the entities which combined to halt the project) control and in no way the result of landowner action. It was governmental action which arguably devalued the property, which was developable except for the interference of the levee project. The landowners' dreams of development were shattered, not by the expected or everyday risks of property ownership, but by a factor within the exclusive control and discretion of the governmental entities involved in the levee project. It is patently unfair and unconstitutional to penalized [sic] the landowners for the effect of these governmental restrictions by refusing to compensate them for this injury to the full extent of their loss.
Id.
Regarding the award of "delay damages," the appellate court agreed with the trial court that the landowner had suffered an unreasonable delay since September 21, 1979, the date the Corps denied BDF's permit. However, because the District did not take over responsibility for the project until September 11, 1985, the court held it could only be held liable for delay damages, calculated at 10% per year simple interest, from that date. Because it amended the award of "delay *1270 damages," the court also amended the award of attorney's fees to 25% of the difference between the amounts deposited in the registry of the court and the amounts the court of appeal was awarding under its decision.[18]
The District sought review from this court, and we granted its writ application to determine the correctness of the judgments below.[19]
IV. ARGUMENTS

A. District
The District on appeal argues: (1) that the property should not be valued as developable at the time of the expropriation because even if the District had turned down the permit for the construction of a levee along alignment E, the landowners did not put on any evidence to meet their burden of showing there was a reasonable probability they would be able to obtain in the reasonably foreseeable future the necessary permits to build their own levee along alignment D, and, in any case, the Corps had shown its intent three times to not grant a permit for the construction of a levee anywhere other than along alignment Eby its denial of BDF's alignment D permit application, its denial of the parish's alignment D permit application, and its implicit denial of the compromise alignment; (2) that at the time of the expropriation the property only had a nominal wetlands value as a result of the Corps' issuance to BDF of a cease and desist order and by its denial of BDF's permit application in 1979; (3) that the Corps denied BDF's permit application in 1979 because of the property's inclusion in the park protection zone and its high quality and quantity of wetlands, and not because of the hurricane levee project, and as such, the devaluation resulting from that denial, if any, cannot be attributable to the District; (4) that it is not the location of a levee constructed by the District along alignment E which retroactively caused the property to be undevelopable at the time of the expropriation but rather it was the landowners' lack of their own levee along alignment D and their lack of a permit to build their own levee along alignment D at the time of the expropriation, neither of which was caused by the project, which gave the property only a nominal wetlands value; (5) that even if BDF could show it was reasonably probable it could obtain a permit to build a levee along alignment D in the reasonably foreseeable future, that levee would have to contain water control structures which would have allowed BDF's land on the unprotected side of the levee to remain wetlands and a § 404 permit would still have been required to develop that land; (6) that because the non-expropriated land which will now be on the unprotected side of the levee only had a nominal wetlands value of $500.00 per acre before the expropriation and has a value of $500.00 per acre after the expropriation, no severance damages are due; (7) that "delay damages" are improper herein because it was not the District's delay between the time it accepted the permit and the time it expropriated the property which prevented landowners from developing their property, but rather, it was the existence of a cease and desist order, the Corps' denial of BDF's permit application in 1979, and BDF's lack of a permit to build its own levee along alignment D, all caused by the Corps for reasons unrelated to the hurricane project, which prevented the landowners from developing their property, and, even if the District had turned down the permit for a levee along alignment E, these conditions prohibiting development would still exist, and (8) that the court of appeal is improperly holding the District liable for actions taken by the Corps which were unrelated to the hurricane project.

B. Landowners
In opposition, the landowners argue: (1) that the acceptance of the alignment E permit by the District finally determined where the hurricane levee would be built, and this determination decided what land uses would be permitted on the property, and until then the property was permittable and developable; (2) that had the District turned down *1271 the offer of a permit along alignment E, the Corps would have been forced to offer to the District or to BDF a permit along alignment D since it was the only other available alternative; (3) that the expropriation by the District has precluded landowners from obtaining a permit from the Corps in the future; (4) that BDF's permit application was denied by the Corps in 1979 because of the uncertainty over the location of the hurricane levee; (5) that the location of the hurricane levee would set the boundary for the park protection zone; (6) that the landowners had a reasonable investment backed expectation their property would be developed; (7) that severance and "delay" damages are appropriate; and (8) that the court of appeal has not improperly held the District liable for actions taken by the Corps.
V. COMPENSATION

A. General Provisions
Article 1, Section 4 of the Louisiana Constitution provides in pertinent part (emphasis added):
Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit.... In every expropriation, a party has the right to trial by jury to determine compensation, and the owner shall be compensated to the full extent of his loss.[20]
Article 1, Section 4 additionally provides, however, that "[t]his Section shall not apply to appropriation of property necessary for levee and levee drainage purposes." Because we are dealing with an expropriation of property by the West Jefferson Levee District to be used to construct a levee, Article 1, Section 4 does not apply. Article 6, Section 42 of the Louisiana Constitution provides in part:
(A) Compensation. Notwithstanding any contrary provision of this constitution, lands and improvements thereon hereafter actually used or destroyed for levees or levee drainage purposes shall be paid for as provided by law.
The legislature has provided in La.R.S. 38:301 et seq. for the compensation due when land has been taken by the state or a political subdivision for levee purposes.[21]
The District's authority to expropriate for levee purposes is found in La.R.S. 38:351 as follows:
[W]henever any levee district or levee and drainage district cannot appropriate or amicably acquire immovable property needed for levee purposes, including but not limited to flooding and hurricane protection *1272 purposes, the levee district or levee and drainage district may acquire the property by expropriation prior to judgment in accordance with the provisions of this Part.[22]
The amount of compensation which the District must pay when it expropriates land is provided for in several statutes. "[A]ll lands... actually taken ... for levee or levee drainage purposes shall be paid for at fair market value to the full extent of the loss." La.R.S. 38:301.C.(1)(a) (emphasis added). More specifically, La.R.S. 38:387 provides, in pertinent part:
A. The measure of compensation for the property expropriated is determined as of the time the estimated compensation was deposited into the registry of the court without considering any change in value caused by the proposed improvement for which the property is expropriated.
B. The measure of damages, if any, to the defendant's remaining property is determined on a basis of immediately before and immediately after the expropriation taking into consideration the effects of the completion of the project in the manner proposed or planned.
C. The owner shall be compensated to the full extent of his loss.
The terms "fair market value" and "full extent of the loss" are defined by statute. "Fair market value" is defined in La.R.S. 38:281(3) as "the value of the lands or improvements actually taken, used, damaged, or destroyed for levees or levee drainage purposes as determined in accordance with the uniform criteria for determining fair market value as defined in R.S. 47:2321 et seq." La.R.S. 47:2321 provides:
Fair market value is the price for property which would be agreed upon between a willing and informed buyer and a willing and informed seller under usual and ordinary circumstances; it shall be the highest price estimated in terms of money which property will bring if exposed for sale on the open market with reasonable time allowed to find a purchaser who is buying with knowledge of all the uses and purposes to which the property is best adapted and for which it can be legally used.[23]
"Full extent of the loss", as defined in La.R.S. 38:281(4), "shall not be construed to include payment for uses which are remote, speculative, or contrary to law; uses for which the property is still suitable; or elements of property ownership which are not *1273 actually taken, used, damaged, or destroyed for levees or drainage purposes."
B. Highest and Best Use
The statutory definitions of "fair market value" and "full extent of the loss" to be used in levee district expropriations are not unique. The jurisprudence has always held in takings cases that the fair market value is the price a buyer is willing to pay after he has considered all of the uses to which the property may be put, where such uses are not speculative, remote or contrary to the law. Based on this definition, a landowner is entitled to compensation based on a potential use of the property, even though the property is not being so utilized at the time of the taking, provided he can show it is reasonably probable the property could be put to this use in the not too distant future, absent the expropriation and project for which the land was expropriated, and provided such a use would have an effect on the price a buyer is willing to pay. This is known as the "highest and best use" doctrine.[24]
In State, Department of Highways v. Rapier, 246 La. 150, 164 So.2d 280, 282 (1964), this court stated:
[I]n an expropriation suit of this nature the proper measure of compensation is the market value of the thing taken, i.e., the price for which the property could be sold by a willing and informed seller to a willing and informed buyer in the condition in which it stood, as well as under the usual circumstances existing, at the time of the expropriation. Further, as it is said, market value means the worth of the land considered in the light of its best and highest use, this being the most favorable employment to which the property is adaptable and may reasonably be put in the not too distant future. In this connection the Court of Appeal aptly stated: "... Potential residential subdivision or industrial use, to serve as the basis of establishing market value in an expropriation proceeding must be shown to be reasonably prospective, as distinguished from remotely prospective, to remove such potential use or classification from the realm of guesswork, speculation and conjecture. If such potential future use is shown within the reasonably near future, the owner is entitled to compensation on the basis of such use notwithstanding the property is not being utilized for such use at the time of the taking."
Because the touchstone of compensation is fair market value, only those potential uses which have an effect on the value of the property, that is, those future potential uses for which a buyer is willing to pay a premium over and above the value at the current use, can be considered.[25] While courts have endeavored to compensate landowners by reaching a fair market value based on the highest and best use to which the property could be put in the reasonably near future, courts have refused to choose a valuation based on those uses which are only remote and speculative, and consequently have no effect on market value.[26] "The potential use value must be reasonable, and within the realm of possibility in the not too distant *1274 future." Nichols' The Law of Eminent Domain § 12B.14 at 12B-140 through 141 (1990).
In Parish of Iberia, supra, 116 So.2d at 496-97, this court recognized:
The ultimate test of value in that respect is what men of wisdom and prudence and having adequate means would devote to the property if owned by them. On the other hand, possible uses which are so remote and speculative and which would require the concurrence of so many extrinsic conditions and happenings as to have no perceptible effect upon present market value should be excluded from consideration.... The owner's plans or hopes for the future should be held completely irrelevant, being more often illusory than real.[27]
In seeking to determine a highest and best use of property which would have an effect on the market value of the property at the time of expropriation in that it would be considered by a willing purchaser and is not remote or speculative, several factors may be considered, including, but not limited to: market demand, proximity to areas already developed in a manner compatible with the intended use, economic development in the area, specific plans of businesses and individuals, including action already taken to develop the land for that use, scarcity of land available for that use, negotiations with buyers interested in the property taken for a particular use, absence of offers to buy the property made by buyers who would put it to the use urged, and the use to which the property was being put at the time of the taking. See M. Dakin and M. Klein, Eminent Domain in Louisiana 171-72 (1970, Supp.1978); State, Department of Transportation and Development v. Hammons, 550 So.2d 767, 771 (La.App. 2d Cir.1989); State, Department of Transportation and Development v. Boagni, 509 So.2d 471, 473 (La.App. 3d Cir.1987).
Another major factor, and the pertinent factor in this case, affecting the probability land could be put to a certain use in the not-too-distant future, is the requirement of a permit for or the impact of a zoning ordinance on the development of the property into its asserted highest and best use. Where there is no reasonable probability a permit for the necessary development could be obtained or that a change to a zoning classification allowing such development could occur in the reasonably foreseeable future, the asserted higher use may not be considered as the highest and best use of the property for purposes of market valuation because such use would be illegal.[28] Where such reasonable probability can be shown, however, it is not the value of the property for the use which would be permitted should the landowner be able to obtain the necessary permit which is to be considered, but rather it is the value of the property as unpermitted at the time of the expropriation *1275 as that value is affected by the reasonable probability a permit could be obtained in the near future which is determinative of market value.
L. Orgel, Valuation Under The Law of Eminent Domain § 34 at 167-68 (1953) states:
The courts have had little difficulty in reaching what seems to us to be a proper result in cases involving zoning ordinances. It is generally held that although an ordinance may prohibit the use of the property for certain purposes at the time of condemnation, yet if there is a reasonable probability that the ordinance may be changed or an exception made, the value for that purpose as affected by the existing ordinance may be considered.[29]
Likewise, Nichols' The Law of Eminent Domain § 12C.03[2] at 12C-75 (1990) (emphasis added) provides:
Where ... there is a possibility or probability that the zoning restriction may in the near future be repealed or amended so as to permit the use in question, such likelihood may be considered if the prospect of such repeal or amendment is sufficiently likely as to have an appreciable influence upon present market value. Phrased differently, it is not considered as a present measure of value, but is considered to the extent that prospective demand for such use would have affected the price a willing buyer would have offered for the property just prior to the taking.
....
[S]uch possible change in the zoning regulations must not be remote or speculative.
On the other hand, the condemnee is not required to prove the reasonable certainty of a change in zoning; a "probability" is not a "certainty." Nor is the condemnee required to prove a "real probability" or "real possibility."
....

The rule of reasonable probability also has been ... applied to the question of the likelihood of obtaining an environmental permit for development.[30]
The current use of the property is presumed to be the highest and best use,[31] and the burden of overcoming that presumption by proving the existence of a different highest and best use based on a potential, future use is on the landowner. Specifically, where a permit is necessary for development of the land in order for the land to be put to its alleged highest and best use, the landowner bears the burden of proving the reasonable probability of obtaining the permit necessary for development in the reasonably foreseeable future. Dietrich, supra, 555 So.2d at 1359; Nichols' The Law of Eminent Domain § 12B.14 and § 12C.03[2] at 12C-83 (1990) ("The burden proving the reasonable probability of a change is on the landowner."); Land, 62.50 Acres, supra, 953 F.2d at 891 ("[I]t is the landowner who must show that there is a reasonable probability that a *1276 potential use would be allowed if that use is to be considered by the trier of fact.").[32]

C. Change in Value Caused by Proposed Improvement
Section A of La.R.S. 38:387 provides compensation due shall not take into account "any change in value caused by the proposed improvement for which the property is expropriated." The meaning of this phrase has been previously interpreted by this court. In Bitterwolf, supra, 415 So.2d 196 (La.1982), this court was faced with interpreting an identical provision found in the "quick taking statute" used for highway expropriation purposes, La.R.S. 48:453(A). We noted this provision, requiring the amount of compensation not consider "any change in value caused by the proposed improvement for which the property is taken," is designed to prevent not only overestimation of an owner's true loss, by precluding compensation for any increase in the property's value caused by the proposal of the improvement or the improvement itself, but also to prevent underestimation of an owner's true loss, by requiring the owner be compensated for any decrease in the property's value caused by the prospect of the impending improvement.
Under La.R.S. 48:453(A), expropriation-induced changes in value, whether upwards or downwards, are excluded from consideration so that neither party will be adversely affected by market abnormalities caused by the prospect of the expropriation. The rules of adjustment were never intended to permit any owner or class of owners to receive compensation, for land taken or damaged, which amounts to more or less than an individual owner's actual loss.

Bitterwolf, supra, 415 So.2d at 202.
As noted in Bitterwolf, the legislature intended, by its inclusion of the pertinent language in La.R.S. 48:453, and likewise in La.R.S. 38:387, first, to recognize the constitutional requirement that the owner shall be compensated to the full extent of his loss, second, to incorporate the established rule that compensation for takings shall not include any increase in market value resulting from the fact that the improvement has been proposed, and third, to expand this rule to provide that any change in market value caused by the proposed improvement, be it a decrease or an increase, shall be disregarded when determining market value and compensation.[33]
In keeping with these purposes, La.R.S. 38:387.A. operates both narrowly and broadly. Under its traditional sense, the statute prohibits this court from using as a basis for compensation the actual fair market value the instant property had at the time of the expropriation where that value would have been higher or lower but for the detrimental or beneficial effects the prospect of the impending expropriation and project had on the property's value. More broadly, however, and in keeping with the statutory mandate in this case to compensate the owners to the full extent of their loss, Section A of La.R.S. 38:387 prohibits this court from using as a basis for compensation the actual fair market value the instant property had at the time of the expropriation where that value would have been higher at the time of *1277 the expropriation but for the project's interference with the property's progression or development toward a different and more lucrative use. Therefore, in this case, if the landowners proved by a preponderance of the evidence BDF's § 404 permit application was denied in 1979 and would have been denied continuously thereafter because of the hurricane levee project, it would appear the project may have caused a "change in value [to the landowners' property] caused by the proposed improvement for which the property is taken" under La.R.S. 38:387.A., and this court would be required to compute fair market value based on the fact the property would have been developable at the time of the expropriation but for the detrimental effects the prospect of the impending project and expropriation had on the property's development.
On the other hand, La.R.S. 38:387.A. also prohibits this court from giving the property a valuation based on the value the property will have after the improvement is completed. Likewise, this court should not consider any increase in value the property would have had in the future had the expropriating entity chosen to locate its improvement somewhere more beneficial to the landowners. That the landowners' land would be developable and valuable if the District had built its hurricane protection levee along alignment D does not meet the landowners' burden of proving their land was developable and valuable prior to the District's acceptance of the permit along alignment E and its expropriation of land thereafter. The same would hold true even had the District obtained a permit for a levee along alignment D. In other words, if the landowners have been unable to construct their own levee for reasons unrelated to the project, their land would be "undevelopable" at the time of the expropriation of land for construction of a levee along alignment D. The fact the levee on alignment D would make landowners' non-expropriated property valuable does not retroactively give the expropriated land a higher value. Instead, the landowners have to show their property was valuable at the time of the expropriation without any increase in value attributable to the benefits which would flow to the property as a result of the proposed improvement, regardless of where it is to be placed.

D. Standard of Review
In an expropriation proceeding, a trial judge's factual determinations as to value of property and entitlement to any other types of damages will not be disturbed on review in the absence of manifest error. State Through Department of Transportation and Development v. Estate of Davis, 572 So.2d 39, 45 (La.1990). Likewise, where the testimony of the experts and witnesses is contradictory and where the judge decides to give more or less weight to the testimony of certain individuals, his findings cannot be overturned unless manifest error appears in the record. McPherson, supra, 259 So.2d at 38. The opinions of experts regarding valuation are advisory and are used only to assist the court in determining the amount of compensation due in an expropriation case. The weight to be given to expert testimony is determined by the trier of fact based on the professional qualifications and experience of the expert, the facts and studies upon which his opinion is based, his familiarity with the locality of the property involved, and the possible bias of the witness in favor of the side for whom he testifies. McPherson, Id. Where the experts disagree as to the value of the land taken, the trial court has much discretion in evaluating and determining the weight to be given to each expert. However, the court's prerogative to weigh varying expert testimony and to reach a value that does not coincide with the testimony of any expert witness may be exercised only when there is evidence in the record to reasonably support the court's valuation. City of Shreveport v. Shreve Land Investors Partnership, 556 So.2d 638, 643 (La.App. 2d Cir.), writ denied, 560 So.2d 7 (1990).
Those factual findings the trial judge has made which do not directly involve the valuation of the property or the credibility of the appraisers are also entitled to deference. This court recently reiterated the jurisprudential rules regarding the standard of review of factual findings in Stobart v. State Through Department of Transportation and *1278 Development, 617 So.2d 880 (La.1993). Therein, we stated:
A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." This court has announced a two-part test for the reversal of a factfinder's determinations:
1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
This test dictates that a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous.
Nevertheless, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. However, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Nonetheless, this Court has emphasized that "the reviewing court must always keep in mind that `if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'"
This court has recognized that "[t]he reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts." Thus, where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong.

Stobart, supra, 617 So.2d at 882-83 (citations omitted).
We have also stated, however, that
[a]n appellate court is not required, because of the foregoing principles of appellate review, to affirm the trier of fact's refusal to accept as credible uncontradicted testimony or greatly preponderant objectively-corroborated testimony where the record indicates no sound reason for its rejection and where the factual finding itself has been reached by overlooking applicable legal principles.

Dabog v. Deris, 625 So.2d 492, 493 (La. 1993) (quoting Mart v. Hill, 505 So.2d 1120, 1127 (La.1987)).
A trial judge's findings of fact are not entitled to deference, and an appellate court will conduct a de novo review of the facts of the case, where the trial judge has made erroneous conclusions of law.[34]
VI. ANALYSIS
By virtue of its filing of these expropriation suits herein, the District has acquired ownership of landowners' land. The District is the expropriating authority and therefore must compensate the landowners to the full extent of their loss which has been caused by the expropriation or the project for which the land was expropriated. Landowners are entitled to those types of damages *1279 in amounts such that they are put in as good a position pecuniarily as they would have been had their property not been taken.

A. Compensation for Property Expropriated
We must first determine the compensation landowners are due for the property actually expropriated in the underlying suits. The trial court, basing its valuation of the land on the values given by landowners' appraiser, William Hartwell, valued all of the expropriated property at an average value of approximately $21,000 per acre. It is undisputed this valuation and the valuation made by landowners' other appraiser, Richard Brewster, are based on the assumption the landowners had the permits in hand or could have easily acquired the permits necessary for constructing a levee along alignment D at the time of the expropriation, thus rendering the property developable at that time for subdivision purposes.[35] It is also undisputed that as a matter of fact, at the time of the expropriation, the landowners did not have the § 404 and § 10 permits required for their construction of a levee along alignment D necessary for the development of their wetlands property into residential subdivisions. Both the District's appraisers and the landowners' appraisers agreed that when one does not assume the permits are in hand or could be obtained without difficulty, the value of the wetlands acreage at the time of the expropriation was approximately $500 to $550 per acre, based on its highest and best use as non-permitted wetlands to be used for hunting, fishing, and recreational purposes.[36]
Therefore, a valuation of approximately $21,000 per acre does not comply with the requirements under La.R.S. 38:387.A. that the "measure of compensation for the property expropriated is determined as of the time the estimated compensation was deposited into the registry of the court" and under La.R.S. 38:301.C.(1)(a) that this measure turn on the property's "fair market value" unless the landowners have shown: (1) that at the time of the expropriation, the land had a potential highest and best use as residential subdivisions which would have had an effect on the fair market value of the land under its current use as unpermitted wetlands; or (2) that any devaluation of the property occurring prior to the expropriation was caused by the District's hurricane levee project such that including that devaluation in the present value of the property would constitute an impermissible consideration of a change in value caused by the proposed improvement for which the property was expropriated.

1. Highest and Best Use
The landowners had already taken some action to develop this land through BDF's construction of the drainage facilities, sewage treatment plant and potable water lines, all of which were dedicated to the parish, as well as by the partial construction of the levee. The land was admittedly in a historical growth corridor of the West Bank. The landowners involved in BDF Development Corporation and the development of the land are all skilled and experienced at building housing developments for profit. The soil types and the land elevations were conducive to residential development with the proper engineering and preparation.
While the above considerations support the landowners' contention and the lower courts' holding that the land should be valued as "developable" at the time of the expropriation at an approximate average of $21,000 per acre, the fact nevertheless remains that at the time of the expropriation the land was not legally developable into residential subdivisions because the landowners lacked the permits required for the construction of a levee necessary for the protection of the property as well as the permits required for the development of the remaining wetlands once the levee was constructed. Because the definition of "fair market value" found in La.R.S. 47:2321 turns on the price which would be agreed upon between a buyer *1280 and a purchaser "who is buying with knowledge of all the uses and purposes to which the property is best adapted and for which it can be legally used," and because use of the property as a residential subdivision was illegal at the time of the expropriation, the landowners, who are entitled to compensation to the fullest extent of their loss, are entitled to compensation at an approximate average of $21,000 per acre under the "highest and best use" doctrine only if they are able to show there was a reasonable probability such a use would have become legal in the reasonably foreseeable future. As explained earlier, in a case involving the necessity of a permit for development of the land into its highest and best potential use, the landowner bears the burden of proving it was reasonably probable the necessary permits could have been obtained in the reasonably foreseeable future had the expropriation and, by extension, the project for which the land was expropriated, not taken place. Specifically, in this case, in order to show their land should be valued based on a use to which the land was not being put at the time of the expropriation, the landowners herein must show it was reasonably probable they could have obtained the § 404 and § 10 permits from the Corps in the reasonably foreseeable future. The landowners failed to meet their burden of proof in this regard. To the contrary, the evidence which is in the record completely repudiates such a conclusion.
The trial court did not directly address the highest and best use doctrine. In its reasons for judgment, the trial court did, however, make several statements which suggest it was implicitly applying the doctrine. The trial court stated the expropriation by the District "determined [the] ultimate value" of the land and, until the District accepted the Corps' permit for the construction of a levee along alignment E, "no final determination for the location of the West Bank Hurricane Protection Levee had been made." The trial court also pointed out the "denial of a particular permit does not preclude the issuance of that same permit at a later time." The court of appeal on this issue stated "the mere fact that property is or contains wetlands does not preclude its development, assuming that a § 404 or § 10 permit could be obtained." Because a "real possibility of a change in the landowners [sic] favor existed" prior to the expropriation, the District's actions "forever foreclosed the possibility of development and it is liable for the market value." The landowners' argument relating to the probability they would have been able to obtain permits had the expropriation not taken place is that had the District turned down the offer of alignment E, the Corps would have been forced to offer the District or BDF a permit for the construction of a levee along alignment D as the only other available alternative. This argument is apparently based on the fact, which is clear from the record, that in the reaches affecting landowners' property only two basic alignments were considered by the Corps, alignments D and E. Therefore, the landowners argue that since the levee "had to be built," the Corps would have been forced to offer a permit to either the District or to BDF along alignment D.
First, an expropriation "determines" the value of the land only to the extent the fair market value of the land taken, for compensation purposes, is based on the value the land had at the time of the expropriation or, more accurately, at the time the expropriating authority deposited its estimation of compensation into the registry of the court. By stating the expropriation "determined" the "ultimate value" of the land, the trial court erroneously implies both that the effects of the expropriation can be retroactively considered in determining the valuation of the property at the time of the expropriation, an approach specifically prohibited in La.R.S. 38:387.A., and that a court should assume a property is capable of a higher and better use simply because the expropriation has by its nature forever precluded the possibility of such use.[37]
*1281 Second, while it is true the denial of a particular permit does not preclude the issuance of that same permit at a later time, the mere fact alone that the later issuance of a permit to BDF was a possibility simply because the later issuance of an earlier denied permit is not precluded by law does not meet the landowners' burden of proving there was a reasonable probability in the reasonably foreseeable future that absent the expropriation and the project, the landowners themselves would have been able to obtain a permit for the construction of a levee along alignment D.
Third, while the District's acceptance of the Corps' offer of a permit for the construction of a levee along alignment E "finally determined the location of the hurricane levee," insofar as the District could not build a hurricane levee without a permit from the Corps and the Corps could not build a hurricane levee without local cooperation, this fact alone merely makes the District liable to the landowners to compensate them to the fullest extent of their loss resulting from the expropriation of the land necessary to construct its levee, with the amount of the compensation to be determined as of the time of the expropriation. This in no way aids the landowners in meeting their burden of proving that absent the expropriation and the project, there was a reasonable probability they would have been able to obtain in the reasonably foreseeable future the permits necessary to construct their own levee.[38] The fact the District accepted the permit for alignment E and filed the suits for the expropriation does not give the landowner's property a value it would not otherwise have had.[39]
*1282 Fourth, the landowners argue that because only two alignments were considered by the Corps in the reaches affecting their property, had the District turned down the permit for alignment E, and not later filed the expropriation suits pursuant thereto, the Corps would have been forced to offer a permit either to BDF or to the District for alignment D in order to achieve its goal of hurricane protection for the West Bank. Therefore, the landowners apparently argue that absent the acceptance of the permit along alignment E and the subsequent expropriation, it was reasonably probable that either the District or the landowners would have been able to obtain the permits for the construction of a levee along alignment D, an improvement absolutely critical to the development of the landowners' property. The possibility the Corps would have offered the District a permit to build a levee along alignment D had the District turned down the permit for alignment E, such that the District would have built a hurricane levee along alignment D, thereby protecting the landowners' land and rendering it developable, cannot be considered as such would result in impermissibly giving the land a value which has been increased because of the effect of the improvement for which the land was expropriated, in violation of La.R.S. 38:387.A. What the landowners would have to show, rather, is that if the District turned down the permit for alignment E, the Corps would have then offered BDF a permit for the construction of a levee along alignment D had BDF applied for such a permit. As will be discussed infra, we conclude, after a thorough and exhaustive review of the record, that there is no evidence to support such a finding; that, indeed, the evidence overwhelmingly indicates there was no reasonable probability BDF would have been able to obtain such permits; and, to the extent the trial court made such a finding of fact, which is not at all clear, that finding of fact is manifestly erroneous. In any case, because the lower courts made the above erroneous conclusions or applications of law regarding the highest and best use doctrine, their findings of fact are not entitled to deference.

2. Change in Value Caused by Proposed Improvement
Although the landowners have failed to meet their burden of proving the land had a highest and best use as a residential subdivision at the time of the expropriation, they are nevertheless entitled to compensation at the "developable" values awarded by the trial judge if they proved that any devaluation of the property occurring prior to the expropriation was caused by the hurricane levee project such that including that devaluation in the present value of the property would constitute an impermissible consideration of a change in value caused by the proposed improvement for which the property was expropriated. Specifically, the landowners would be successful if they could show their inability prior to the expropriation to obtain the permits required for the construction of their levee along alignment D and to develop their property was caused by the hurricane levee project.
In response to the District's argument below that the devaluation of the landowners' property was caused by the Corps of Engineers and the federal government and not the hurricane levee project, the trial court held "the levee alignment selection process was a continuous project beginning in the late 1960's and ending only when the West Jefferson Levee District finally acted upon the permit issued for levee alignment alternative modified E." The trial court also found "the only reason the Corps did not issue those permits to Bayou des Families in late 1975 or early 1976 was the uncertainty over the location of the West Bank Hurricane Protection Levee, which is the Project for *1283 which the Property has been expropriated," and "the denial of the Bayou des Families § 404 and § 10 permits, the selection of Alternate E, and the expropriation of the right-of-way for the West Bank Hurricane Protection Levee in these proceedings, are all part of the same Project." Finally, the trial court concluded "the loss of value suffered by the Property was caused by the proposed improvement for which portions of the Property have been expropriated." Regarding this issue, the court of appeal first noted "[t]he market values were destroyed by that final act [the expropriation suits]." The appellate court also stated:
Even if we were to agree with the Levee District that the value of the land was nominal, both before and after the taking, we would still reach this same conclusion [that the trial court's valuation is correct] because the inability to get a permit or develop the land prior to the takings was wholly the result of governmental (all of the entities which combined to halt the project) control and in no way the result of landowner action. It was governmental action which arguably devalued the property, which was developable except for the interference of the levee project. The landowners' dreams of development were shattered, not by the expected or everyday risks of property ownership, but by a factor within the exclusive control and discretion of the governmental entities involved in the levee project.
The lower courts have erred in several respects. First, the lower courts, and especially the trial court, by the above statements suggest the District should be required to pay compensation based on a valuation of the land as protected by a levee and therefore developable, because had the District built its hurricane protection levee along alignment D, the landowners' land would have had such a value.[40] This not only impermissibly gives the land a value affected by the improvement for which the land was expropriated but makes the further mistake of assuming a value the land would have had if the improvement had been built in a different location more beneficial to the landowners. The landowners make a similar argument when they assert that it was the acceptance of the alignment E permit by the District and its actions thereunder which finally determined where the levee would be built, and that such a determination decided what land uses would be permitted on the property. Every expropriation necessarily determines what land uses will be thereafter permitted on the property. It is undisputed, however, that at the time of the expropriation, the land was not legally developable into residential subdivisions because the landowners did not have the permits necessary for development. No expropriating authority has a duty to expropriate land and build an improvement in a location which will benefit a landowner by making his land developable. Neither does the expropriating authority have to pay damages based on the value the land would have had had the expropriating authority built its improvement in a location more beneficial to the landowner.[41] Likewise, the authority does not have to pay compensation based on a value of the land as "developable (i.e. permitted and protected) land" if the land was already undevelopable, at the time of the expropriation, for reasons unrelated to the project for which the land is expropriated.
Second, the court of appeal clearly erred when it stated the expropriation suits "destroyed" the market value. The market *1284 value of the land had been destroyed prior to the expropriation since, at the time of the expropriation, the land was not legally developable as intended and was unpermitted, unprotected wetlands. Thus, the landowners must instead be able to show either that they would have been able to obtain the permits required to construct their own levee which was necessary for the property to be developed had the land not been expropriated (under the highest and best use doctrine), or alternatively, that their inability to obtain the permits, and the resulting devaluation to the land, was caused by the hurricane levee project.
Third, the court of appeal also implies it is holding the District liable for any devaluation to the property occurring prior to the expropriation which was caused by the Corps of Engineers' actions where it states "because the inability to get a permit or develop the land prior to the takings was wholly the result of governmental (all of the entities which combined to halt the project) control and in no way the result of landowner action," the District should be held liable. If the Corps had denied BDF's permit application, and would have continued to deny BDF's permit applications, had they been applied for, because of the hurricane levee project, then the District could be held liable for the devaluation of the property caused by the Corps' actions because the change in the value of the property would have been caused by the proposed improvement for which the property was expropriated. However, since the Corps denied BDF's permit application, and would have continued to deny landowners' applications, for reasons unrelated to the hurricane levee project, as the evidence in the record overwhelmingly indicates, the District cannot be held liable for any devaluation caused by the Corps' actions.
Fourth, it is absolutely clear from the record, and indeed the landowners' own expert in the permitting process, Dr. Sherwood Gagliano, so testified, that BDF's application for § 404 and § 10 permits was denied by the Corps of Engineers in 1979 because of the ramifications resulting from the inclusion of landowners' land in the Jean Lafitte Park park protection zone, and that BDF would have been unable to obtain such permits at any time after 1979 for the same reason. As will be discussed infra, the evidence in the record does not support the conclusion BDF's permit application was denied in 1979 in any measure because of the existence of or uncertainty over the location of the hurricane levee project. Rather, the evidence unequivocally shows the permit application was denied and would have been continuously denied, even absent the hurricane levee project, because of the property's location inside of the park protection zone of Jean Lafitte Park and because of the growing national policy toward the more stringent preservation of wetlands. Since there is no evidence in the record to support the trial court's findings to the contrary, those findings are manifestly erroneous. Furthermore, because both lower court opinions contain the above inaccurate statements of law and "factual findings" which imply incorrect legal conclusions, any factual findings made by the trial judge are not entitled to deference.

3. The Record
The record unequivocally shows BDF's permit application was denied by the Corps in 1979 because of public and political pressure on the Corps to preserve the landowners' wetlands property as undeveloped and unpermitted wetlands because of its inclusion in the park protection zone of Jean Lafitte Park and because BDF's permit application did not meet the criteria at that time for the granting of a permit. Furthermore, the record also reveals that even if the hurricane levee project was not in existence and BDF had continued to reapply for permits up until the expropriation suits were filed, the permit applications would have continually been denied due to the land's inclusion in the park protection zone and because of the emerging national policy in favor of preserving wetlands unless development was absolutely necessary. For these reasons unrelated to the hurricane levee project, the wetlands acreage of the property had a nominal value of $550 per acre at the time of the expropriation. The District may not be held liable for this devaluation. The record also shows that for *1285 the same reasons, there was and is no reasonable probability that in the reasonably near future after the expropriation the landowners would have been able to obtain the necessary permits for developing their land into its highest and best use of residential subdivisions had the project and resultant expropriation not taken place.

(a) The 1979 Denial of BDF's Permit Application
The Corps of Engineers issued BDF a cease and desist order in January of 1974, prohibiting further construction of its levee and further development of the property because such construction lacked the § 10 and § 404 permits legally required under the Rivers and Harbors Act and the FWPCA. The Corps allowed BDF to apply for after-the-fact permits in 1975. This application was denied in 1979. During the pendency of the above action, Congress had begun to study the feasibility of the establishment of a national park in Louisiana in August of 1972, and, in 1978, the park was created by statute.
All of the evidence in the record supports the finding that the application was denied for reasons unrelated to the existence of or uncertainty over the hurricane levee project. The District Engineer's articulated reasons for his denial of BDF's permit application state the following:
I find that denial of the Department of the Army after-the-fact permit prescribed by regulations published in 33 C.F.R. 320 through 329 to Bayou Des Families Development Corporation is based on thorough analysis and evaluation of the various factors enumerated above; that there are reasonable alternatives available that will achieve the purposes for which the work is being constructed; that the proposed work is not in accordance with the overall desires of the public as reflected in the comments of state, Federal, and local agencies and the general public; that the proposed work does not comply with established State and local laws, regulations and codes; that there have been identified significant adverse environmental effects related to the work; that the denial of this permit is consonant with national policy, statutes, and administrative directives; and that on balance the total public interest should best be served by the denial of a Department of the Army after-the-fact permit to Bayou Des Families Development Corporation.
The District Engineer's findings of fact in the denial of BDF's application note there were nearby undeveloped nonwetland areas which could have been developed for the same purposes, the BDF project would have had major adverse impacts on Jean Lafitte National Park and on the environment, and the approval of the project would have been in violation of national policy on the preservation of wetlands.
The landowners' answers and post trial memoranda in the instant expropriation suits allege the permit was denied because of the opposition by park supporters who wanted to protect and preserve as undevelopable as much of the wetlands as possible which were located in the park protection zone.
Dr. Lloyd F. Baehr, Jr., who has worked for the Corps since 1976, and who is presently chief of the permitting unit, testified BDF's permit was denied in 1979 because there was a lack of public need to destroy the wetlands, there was no need for the type of amenities suggested by the proposal, and there were available non wetland alternative sites.
The federal district court in Bayou des Families Development Corp. v. United States Corps of Engineers, 541 F.Supp. 1025 (E.D.La.1982)[42] found the Corps' denial of BDF's permit was not arbitrary and capricious and was consistent with the Corps' statutory and regulatory mandate to grant no permit unless it is found to be in the public interest and to evaluate the effects of a proposed project on the wetlands with an eye toward discouraging the unnecessary alteration or destruction of wetlands. The federal district court stated:
The Corps evaluated the public comments, the comments of governmental agencies, the data generated by the Corps, and the data presented by BDF and its *1286 consultants in reviewing BDF's application. Of key concern to the Corps were the comments from the public and from other federal agencies relating to the environmental effects of the proposed work.
The area in question provides for water filtration, assists in maintaining the salinity regime for the Barataria Basin, provides habitat for terrestrial and aquatic fauna, and provides significant detritus export vital to the maintenance and health of Louisiana Gulf fisheries.
Development of the area in question and the destruction of almost 2,000 acres of wetlands would result in the loss of wildlife habitat, the loss of water purification and filtration benefits, and have significant adverse impacts on the Barataria Bay fisheries resources due to loss of detritus contribution and habitat. After evaluating the above factors and weighing the public need against the private need for the project, as required by Corps' regulations, the District Engineer concluded that the proposed work would not be in the public interest.
Based on the evidence in the administrative record before the Corps at the time it denied plaintiff's permit application on September 17, 1979, the Corps' decision was not arbitrary or capricious, an abuse of discretion, nor otherwise not in accordance with law. The Corps considered all relevant factors. The Corps was required by regulations to consider not only the flood protection aspects of the proposed project but other factors, including water dependence of the project and ecological consequences, effect on wetland water quality, and effects on fish and wildlife habitat.
Bayou Des Families, supra, 541 F.Supp. at 1038.
Furthermore, in addressing the reason for the Corps' four year delay in acting on BDF's application, the court stated:
The Corps' consideration of the impact of possible effluent from plaintiff's proposed sewage treatment plant on the park, and respect for the park Administrator's request that a levee not be constructed within the park boundaries, did not exceed the Corps' statutory mandate to consider the environmental effects of the proposed project, although consideration of those factors may have slowed the processing of BDF's permit application.
Id. at 1040 (citation omitted).
Additionally, in response to BDF's argument the Corps should have granted its permit for the construction of a levee along alignment D because the Corps had previously indicated in 1972 that it wanted to build its hurricane levee along alignment D or that the Corps itself was obligated to build the hurricane levee along alignment D, the federal district court observed:
In 1974 Congress amended the Flood Control Act to require the Corps, in formulating flood control plans, to employ the most economically, socially, and environmentally acceptable means of reducing or preventing flood damages. Even if the Corps did, in mid-1972, propose an alignment similar to that along which plaintiff later began construction of a levee, the Corps was not bound by that proposal.
The Corps was, however, required to take subsequently enacted federal legislation, including the FWPCA, the amendment to the Flood Control Act, and the Park Act and regulations, into account in developing a proposal for hurricane protection on the West Bank. Even if the 1972 proposal had passed an earlier cost-benefit analysis, the Corps could not ignore the Congressional policies expressed in subsequent legislation. Thus, the Corps has properly considered subsequent legislation, specifically that legislation relating to environmental protection and to establishment of Jean Lafitte Park, in developing a flood control proposal for the West Bank.
Id. at 1041-42 (citations omitted).
The fact the Corps' preferred alignment for the hurricane levee in 1972 was along alignment D supports the conclusion BDF's permit application was denied in 1979 not because of the hurricane levee project but for other reasons. The hurricane project had been ongoing since 1965. In 1972, the Corps indicated its desire the hurricane levee be placed along alignment D. An internal memorandum of the Corps filed into evidence by *1287 landowners shows the Corps recognized there was no reason to deny BDF's permit application if the Corps's hurricane levee was to be placed along alignment D also. However, between 1972 and 1979, two important events occurred which were totally unrelated to the hurricane levee projectthe passage of the FWPCA amendments with the corresponding growing national concern over the preservation of wetlands and the creation of Jean Lafitte National Park, which included landowners' wetlands in its park protection zone. The Corps was willing to allow its hurricane levee to be built along alignment D in 1972 but was not willing to let BDF build its levee along alignment D in 1979, even though the Corps had earlier recognized the two levees would not be conflicting along such an alignment. It was the intervention of the FWPCA, the concern over preservation of the large area of wetlands, and the desire to preserve the undeveloped nature of the park protection zone of Jean Lafitte Park, and not the existence of or uncertainty over the hurricane levee project, which led to the denial of BDF's permit in 1979.
One of the owners of BDF Development Corp., Wilson P. Abraham, testified at trial the existence of Jean Lafitte Park was the reason for the Corps' alleged procrastination on the permit application, and the National Park Service "vigorously resisted any idea of developing" BDF's property at every meeting on the topic.[43]
Dr. Sherwood Gagliano, the witness whom landowners' tendered and the court accepted as an expert in the Corps' permitting process and whom the trial court found to be extremely credible, testified the delay the Corps took in acting on BDF's permit was caused by people interested in preserving the undeveloped nature of the land included in the park protection zone, and that ultimately the permit was denied because of the land's inclusion in the park protection zone. Dr. Gagliano testified numerous times during trial that in his opinion, the park "was the deciding factor in the denial of the [BDF] permit." Furthermore, after reviewing various permit denials and grants by the Corps in the general vicinity of landowners' property, Dr. Gagliano testified the main difference between those projects and BDF's project was the fact that BDF's property was included within the boundaries of Jean Lafitte National Park. In the areas where permits for the development of wetlands were granted, "no state or national park was in the area of consideration of those permits." Additionally, Dr. Gagliano stated the landowners had a reasonable expectation of developing their property in 1972 because BDF's levee was to follow the Corps' preferred alignment for its hurricane levee, and the only thing which affected their reasonable expectation was the creation of Jean Lafitte National Park.
Landowners introduced into evidence, through Dr. Gagliano's testimony, several letters from various organizations which were circulated during the pendency of BDF's permit application and which discussed BDF's permit in relation to the park. Exhibit 127 is a letter from the director of the Louisiana State Parks and Recreation Commission which states that agency conducted an EIS *1288 which concluded the BDF levee alignment would be in conflict with the park. Exhibit 128 is a letter from the Superintendent of the Jean Lafitte Park to the regional director of the National Park Service which Dr. Gagliano interpreted as revealing the Superintendent believed he could keep the developers from developing their property, and thus, out of the park protection zone, through use of the § 404 permit process, and, that by doing so, he would keep the value of the property low for purposes of the park's acquisition of it later on. Exhibit 129 is a letter from the same Park Superintendent to the district engineer of the Corps in response to the Corps' request for comments on BDF's application. The letter objects to the permit because of its impact on the park protection zone and the core area of the park. Exhibit 130 is a letter from the Corps to the landowners dated several months prior to the permit denial discussing the comments it had received on the park and recommending BDF withdraw its application because it was likely to be denied.[44] Dr. Gagliano testified this particular letter makes it clear the BDF permit was denied because of the park protection zone.
The landowners rely on an internal Corps' memorandum from 1975 for the proposition that the later denial of their permit in 1979 was related to the hurricane levee project. In this memo, introduced into evidence as LO-26, an employee of the Corps states in part:
(a) It is apparent that the decision on the issuance of a permit and the decision on the West Bank Hurricane Protection project are closely related. In fact, the decisions should be made in concert.
(b) If a decision is made to deny the permit application, it would be inconsistent to propose a Corps levee in the same area.
If we propose to build a hurricane levee near the alinement [sic] of the Bayou des Families levee, there is no reason why a permit should not be issued.
(c) Strong opposition to issuance of the permit has been expressed by EPS, NMFS, USF & WS, the State Parks and Recreation Commission, and the State Planning Office. It is probable that these same agencies will also oppose a hurricane levee which destroys the wetlands of this area.
This memo does not state or imply, as asserted by the landowners, that the BDF application would be denied because of the hurricane levee project. Rather it only explains that if BDF's permit application to construct its own levee along alignment D is denied, it would be inconsistent for the Corps to later seek to build its hurricane levee along alignment D because the same groups which oppose BDF's permit application would also oppose the Corps' placement of a hurricane levee along alignment D for the same reasons.
It is clear from the record that BDF's permit application was denied by the Corps in 1979 because of the desire to preserve the wetlands in the park protection zone as undeveloped wetlands and because BDF's permit application did not meet the criteria for the granting of a permit. Thus, any devaluation to the property caused by this permit denial cannot be attributed to the District as it is unrelated to the project for which the District sought to expropriate the property.[45]

(b) The Likelihood BDF Could Have Obtained A Permit for the Construction of its Levee from 1979 to the Present
Even though the landowners urge to the contrary, the evidence clearly *1289 shows that had BDF continued to reapply for permits up until the expropriation suits were filed, its permit applications would have continually been denied not because of the hurricane levee project but because of the land's inclusion in the park protection zone and the park supporters' desire to preserve the land in the park protection zone as undeveloped wetlands and, for the additional reason that the trend of emerging national policy was ever-increasingly in favor of preserving wetlands unless development was absolutely necessary. The record also shows that, for the same reasons, there was no reasonable probability in the reasonably near future after the expropriation that the landowners would have been able to obtain permits necessary for developing their land into its highest and best use of residential subdivisions had the project and the expropriation not taken place.
That BDF's permit application for the construction of a levee along alignment D would have been denied for the above reasons, had BDF reapplied in the early 1980s, is supported by several sources in the record, but is bolstered most convincingly by the fact the Parish Council's own application for the construction of its hurricane levee along alignment D, as well as a compromise alignment suggested by the landowners and supported by the parish, were both rejected by the Corps. On November 20, 1980, the District Engineer wrote to the Parish Council to inform it that its application for the construction of a levee along alignment 3-C, an alignment similar to BDF's alignment in the reaches affecting BDF's property, would be denied because it encompassed too much wetlands, allowing for their development.
The Parish Council's application for a permit along Alignment D, made on June 19, 1981, was also later denied. During the consideration by the Corps of the parish's permit, the park proponents continued to vigorously contest the placement of any levee, be it BDF's or the parish's, along Alignment D.[46] Several federal and state agencies wrote to the Corps, recommending it deny the parish's permit for alignment D because of its significant impact on the wetlands and on the park.
Dr. Sherwood Gagliano, at the behest of the landowners and the parish, presented a "compromise alignment" located at the midpoint between alignments D and E to the Parish Council and to the Corps at a public hearing on April 17, 1984. The Parish Council adopted a resolution approving of the compromise alignment and urging the Corps to consider it. On June 18, 1984, the Corps denied the Parish Council's application for a permit to construct a levee along alignment D. The denial of the parish's application for a permit on alignment D was also an implicit denial of the compromise alignment. The Findings of Fact of the Corps' denial note the Parish Council had requested the Corps consider the compromise alignment. Furthermore, Dr. Lloyd F. Baehr, Jr., who has worked for the Corps since 1976 and is the current head of its permit division, testified the Corps considered the compromise because it considers all comments made during a public hearing concerning a permit application, and the Corps' rejection of the Council's permit along alignment D and its offering of a permit only along alignment E and not along the compromise alignment, indicate the *1290 Corps also rejected the compromise alignment.[47]
The Corps eventually offered the parish a permit for the construction of a levee along alignment E only.[48] The record does not support the conclusion that had the District turned down the Corps' offer of a permit along alignment E, the Corps would have offered BDF a permit to construct its levee along alignment D. The landowners argue that the Corps would have been forced to offer a permit along alignment D if the District turned down alignment E because the Corps knew that a levee to protect the West Bank from hurricanes had to be built. To the contrary, the record does not reveal the Corps' primary concern was the prompt construction of a hurricane protection levee. The record is clear the Corps knew the District/Parish Council had, from the 1970s, wanted either its levee or BDF's levee to be built along alignment D. The Corps knew the District/Parish Council strongly desired to provide hurricane protection to its citizens. Yet, the above considerations did not preclude the Corps from: (1) taking four years to act on BDF's alignment D permit application, (2) from denying BDF's permit application in 1979, (3) from taking three years to act on the parish's alignment D permit application, (4) from denying the parish's permit application in 1984, or (5) from denying a permit for the compromise alignment. Nor did it preclude the Corps, and the federal government, from failing to agree to provide any federal funding for the parish's hurricane levee until 1990. Furthermore, testimony at trial bears out the conclusion the Corps would offer a permit for the construction of a levee, be it BDF's or the parish's, only along alignment E.
Ronald R. Besson, president of the District from 1980 through 1990, testified the Parish Council was told by the Corps it would only grant a permit along alignment E. "[T]he Corps of Engineers came back to the parish council, denied the permit for alignment D and told them that the only alignment that they would grant a permit would only be the modified alignment E." Regarding the Corps' intent, after it had denied the parish's application for alignment D but prior to the parish's acceptance of a permit along alignment E, Besson further testified as follows:
Q: Had you ever been advised or the Corps, the Levee District ever been advised to your knowledge or have you ever been advised when you were president of the West Jefferson Levee District by anybody from the Corps that the reach of the levee along modified alignment E was ever in question of being changed or modified?
A: No.
Q: So to your knowledge there was never in your mind, in the minds of the West Jefferson Levee District any question about where this levee was going to be built insofar as it affects the property that's the subject of this litigation?
A: No question at all.
....
A: [I]t was never a doubt to us of where the alignment was [despite the fact that several alignments were discussed in the February 1984 EIS issued by the Corps] because the federal government and Corps of Engineers made it very very clear to us that it was either alternative alignment E or nothing.
We have explained earlier why the landowners must be able to show the Corps would have offered BDF, and not the District, a permit for alignment D, had the District turned down the permit for alignment E. In any case, however, the testimony of Dr. Baehr, head of the permit division for the Corps, and one of the Corps' employees who worked on the parish's permit, indicates the *1291 Corps only considered alignment E for the hurricane levee. He testified the permit for alignment D was denied mainly because the hurricane levee was intended to protect developed areas, and landowners' wetlands property was not developed and therefore did not need protection.
A: [I]t was still going to impact a great deal of wetlands unnecessarily because the basic purpose of the project was to protect developed property on the Westbank and this was not going to protect developed property but protect wetlands and we saw that as an unnecessary activity since the basic purpose of the project was not stated to protect undeveloped property for future development.
....
A: See the idea behind the permit as we understood it is that the permit was requested to protect developed property on the Westbank of Jefferson Parish. We did not consider wetlands as developed property. And therefore, we eliminated wetlands from the evaluation process because it was the least damaging environmental alternative.
Thus, even if the Parish Council had turned down the permit for alignment E, no evidence adduced indicates the Corps would have offered the District a permit for alignment D, as Dr. Baehr testified the hurricane levee was not intended to protect undeveloped wetlands.
Furthermore, Dr. Gagliano also testified that had the District/Parish Council turned down the Corps' offer of alignment E, the Corps would not have offered alignment D.
Q: [D]o you feel that the only alignment that the Corps would allow a levee to be built on in 1986 was the alignment known as modified E?
A: Yes.
Q: Do you feel that in 1989 had, had not the parish not accepted the permit for modified E, that the Corps would have allowed construction of a levee along a different alignment?
....
A: Not without opening the whole new process. The Corps made a decision and they said alignment E is where the levee will be built, yes.
Q: I'm talking about 1989 had not had the parish not accepted the permit for modified E, do you feel that the Corps would allow a levee to be built on any other alignment other than that which we have identified as E?
A: No.
The testimony of Dr. Terry Howey, the director of the Coastal Management Division in the Office of Coastal Management and Restoration in the Department of Natural Resources, further indicates that even assuming the project and the expropriation had not taken place, the landowners would have been unable from 1985 and into the future to get the permits necessary to develop their land. Under federal law, the Corps will not issue a § 404 permit unless the state coastal management program, which came into existence in 1980 and of which Dr. Howey is the director, has issued the corresponding state permits.[49] Dr. Howey, after being shown an aerial photo of BDF's property, testified regarding the probability BDF could have obtained the state permits where such land has been designated wetlands by the Corps. He stated: "I would characterize the probability of getting a permit for a type of development [for the construction of a levee and the development of the remaining land into subdivisions] such as you have described in this type of area, and of this magnitude in terms of acreage, as an extremely difficult proposition and it would be very difficult to obtain a permit for this area. I know of no permits that have been issued for similar types of areas of similar acreage in the period of time that I have been working for the Coastal Management Division." Although Dr. Howey agreed the parish had been able to obtain the state permit for the construction of the levee alone when it applied to the Corps for a permit to build a levee along alignment D in 1981, he pointed out the probability of obtaining the same permit today is considerably lower.
*1292 One of the landowners himself testified the failure of landowners to be able to develop their land in 1984 was based on the cease and desist order issued by the Corps and the Corps' denial of BDF's permit in 1979, which we have already found to be unrelated to the hurricane project. Wilson Abraham, a BDF principal, testified:
A: The Corps of Engineers had a cease and desist. We couldn't move. We could do absolutely nothing with that property. We had paid a twenty-five thousand dollar fine to the federal government with specific orders to stop. That was back in seventy something and we stopped.
Q: So as a result of the Corps' denial of your permit, you could do nothing with the property?
A: Absolutely nothing, yes sir.
....
Q: Is it your position or contention then that the inability of BDF to be able to get a permit to build the levee along the rear of its property line to the west was the cause or reason you weren't able to develop this property?
A: You're one hundred percent correct sir.
Mr. Abraham was also asked about the probability BDF would have been able to obtain the permits from the Corps assuming the hurricane project was not in existence.
Q: [A]ssume alignment E and construction of the levee is not going on along Barataria Boulevard and it's 1986 and 1985, do you feel that you could get a permit from the Corps of Engineers to develop your property in 1985?
A: No.... They wanted it for Lafitte Park all indications were and I think the Corps might have acquiesced in the earlier letter as I read they were in favor of it and then the Lafitte Park, Isenogle [the park superintendent] and that bunch got involved and it was hopeless.
Q: So in 1988 and 1989 even if there was no levee along Highway 45, you don't believe you could get a permit to develop it then?
A: No sir; I really don't.
....
Q: So is it fair to say you do not feel you would have gotten a permit from the Corps at any time after 1979?
A: I don't thinkwe might have a little bit later on but again as I stated they did turn us down [in 1979] and I think had not the park come into being, we would have gotten our permit.
An additional impediment to the landowners' attempting to prove the reasonable probability of BDF obtaining the necessary permits in the late 1980s and up until the present, is the growing difficulty in obtaining permits for development of wetlands. Dr. Gagliano testified that "in February of 1989, the so-called manual for wetland delineation was made public by four agencies; the Corps of Engineers; US Fish and Wildlife Service; National Marine Fisheries Service; and Soil Conservation Service which significantly changed the permitting process. This was followed shortly thereafter by the signing of a memorandum of agreement between the US Army Corps of Engineers and EPA which made it even more difficult to acquire permits for any type of development in wetland areas." (emphasis added).[50]
*1293 Additionally, Dr. Gagliano testified quite pointedly that even absent the hurricane levee project, the landowners would have been unable to obtain the required permits necessary for the development of their property from 1980 up until the present because of the land's inclusion in the park protection zone, a factor totally unrelated to the hurricane project, and for which the District should not be held liable.
Q: [W]e all know that the BDF permit application for, to build the levee along the rear of their property which coincides with the alignment that we've been referring to as D was denied in 1979 by the Corps and I believe your opinion was that the reason for that denial was really because of the Jean Lafitte Park and the park protection zone?
A: Yes.
Q: That's basically correct? And as a result of that denial, they were not able to develop their property; is that correct?
A: Yes.
Q: And not being able to develop their property took it out of commerce; is that correct?
A: They took it out.
Q: In other words, the denial of the permit prohibits the landowner from developing the property. If he can't develop his property, it's taken out of commerce; is that correct?
A: Yes.
Q: In your opinion, if the landowners in this case had applied to the Corps in 1980 or a permit to develop their property as a residential subdivision, could they have gotten a permit from the Corps?
A: In 1980?
Q: 1980.
A: No.
Q: Why?
A: Because of the park protection zone.
Q: In 1981, the landowners had applied to the Corps for a permit to develop their property, in your opinion, would they have gotten a permit?
A: No, because of the same issue, because of the park.
Q: In 1982 if the owners had applied to the Corps of Engineers to develop their property, in your opinion could they have gotten it?
A: No, because of the park.
Q: In 1983 if the landowners had applied to the Corps for a permit to develop their property in your opinion could they have gotten it?
A: No, for the same reason.
Q: In 1984 if the landowners had applied to the Corps of Engineers for a permit to develop their property in your opinion, would they have received it?
A: No, because of the presence of the park.

*1294 Q: In 1985, if the landowners had applied to the Corps for a permit to develop their property, could they have received it?
A: No, for the same reason.
Q: In 1986, if the landowners had applied to the Corps for a permit to develop their property, could they have gotten it?
A: No, for the same reason but I must add ... that in all of these time frames had the park not been a major driving issue in the permit decision in my opinion they would have had a very good opportunity, very good chance of acquiring a permit....
Q: In 1987 if the landowners had applied to the Corps of Engineers to develop their property, do you think in your opinion that the Corps of Engineers would have granted that permit?
A: No, because of the park issue.
Q: In 1988 if the landowners had applied to the Corps of Engineers for a permit to develop their property, do you think they would have received it?
A: No, because of the park issue, and I put the same explanation on those dates as well.
Q: And in 1989 if the landowners had applied to the Corps of Engineers for a permit to develop their property, do you think that they in your opinion, do you feel that it would have been granted?
A: No, subsequent to the passage of the introduction of the wetland delineation manual and the new memorandum of agreement and the President's no net loss of wetland policy, it becomes increasingly difficult to acquire a permit. In fact, I really, it's my opinion that permits may be in a state of limbo at present because of uncertainty as to how these programs are going to be administered. So I can't give you a definitive answer to that question.
....
A: [I]f the park were not an issue, there would be other elements coming into play in 1989 that might cause denial of a permit....
Q: In 1990 if the landowners had applied to the Corps of Engineers for a permit to develop their property in your opinion, do you think they would have received it?
A: I think the park again would be a major issue in the issuance of the permit.
The landowners seek to tie the effect the park protection zone has on their ability to get their own permits to the hurricane levee project by asserting the ultimate location of the hurricane levee was to decide the boundaries of the park protection zone. The landowners assert this in brief, and Dr. Gagliano made this statement several times during his testimony. To the extent the trial judge made such a finding of fact, it is manifestly erroneous, as it is unsupported by the record and legally incorrect. Dr. Gagliano gave no reason for his conclusion in his testimony. The boundaries of the park protection zone were set by statute in 1978. See 16 U.S.C. §§ 230, 230a(a), and 230a(b). Therein, it is stated that the Barataria Marsh Unit of the park would include 20,000 acres, 8,600 of which would comprise the core area and 11,400 of which would comprise the park protection zone. The statute refers to a map, numbered 90,000B and dated April, 1978, as depicting the boundaries of these areas. The landowners introduced into evidence a map one of its experts had drawn in 1987 in order to show the location of landowners' property in relation to the park protection zone boundary. That exhibit states on its face that the expert used map 90,000B dated April 1978 as the basis for his drawing. Although 16 U.S.C. § 230a(f) states: "The Secretary [of the Interior] may revise the boundaries of the park protection zone, notwithstanding any other provision of law, to include or exclude properties, but only with the consent of Jefferson Parish," no documentary or testamentary evidence whatsoever was offered to indicate the Secretary intended to revise the boundaries of the park protection zone depending on where the hurricane levee was to be built or that there was even any discussion by any of the parties involved that such would occur. The only indication of this in the entire record were the statements by Dr. Gagliano, who gave no factual basis for this conclusion.
Finally, the lower courts seem to rely on the existence of the Local Cooperating *1295 Agreement signed by the parish and the Corps in 1990 in reaching their decisions. While we agree with the lower courts and with landowners that the record shows the Agreement which deals with the sharing of costs between the federal government and the District for the construction of the West Bank Hurricane Protection Levee, a much more extensive levee than the locally funded levee which the District expropriated landowners' land for, is intended to include the costs of the instant expropriation, such a fact does not change the valuation of the property at the time of the expropriation. That the Corps has agreed to share the costs of this expropriation does not give the property a higher value than it would have had had the Corps not agreed to share the costs. Furthermore, the Local Cooperating Agreement does not reveal an intent that the District be held responsible for any devaluation to landowners' property caused by the Corps, the National Park Service, or the federal government occurring prior to the expropriation in this case where that federal action and the resultant devaluation were unrelated to the project covered by the Agreement.[51]

4. Valuation
Because we have concluded the property was not developable into residential subdivisions at the time of expropriation and did not have a reasonable probability of becoming so developable in the reasonably near future, both for reasons unrelated to the hurricane levee project, we find the values ascribed to the property by the trial court to be manifestly erroneous. We instead find the evidence indicates the property at the time of the expropriation had a value based on its highest and best use as nonpermitted wetlands which could be used only for recreational purposes. Thus, we must determine the fair market value of nonpermitted wetlands from the evidence introduced in this case.
All experts testified the mere possibility unpermitted land might be able to obtain the necessary permits some time in the future would have no effect on the market value of unpermitted, wetlands property. In other words, based on the evidence adduced in this case, it does not appear the value of wetlands property lacking a permit would ever increase to more than the nominal value of $550.00 per acre based on some possibility that a permit may be able to be obtained in the future, as all appraisers herein testified such a possibility has no effect on the fair market value of wetlands.
According to the record, the landowners, whose burden it is to prove entitlement to compensation over and above that deposited into the registry of the court, had their appraisers base their appraisals of the property on the assumption either that the property had the permits necessary for construction of a levee or that there was no impediment to the acquisition of such permits. As explained, earlier, this assumption, made by the landowners and their appraisers, is erroneous.
Although the landowners did not introduce into evidence appraisals of their land as unpermitted, undevelopable wetlands, their appraisers agreed with the District's appraisers at trial regarding the valuation of unpermitted, undevelopable wetlands. Additionally, all of the appraisers negated the proposition that purchasers are willing to pay a premium for the land (a value over and above the actual wetlands value of $550.00 per acre) despite the uncertainty of ever obtaining permits for the development thereof. The appraisers testified that such a "premium", or sliding scale based on the possibility of obtaining a permit, did not exist in the market, and that unpermitted wetlands were only worth $500 to $550 per acre.
Landowners introduced the testimony of two appraisers. William Hartwell testified as follows:
Q: Now, with the fact, in 1986, and without knowing whether or not a permit could be granted or denied in 1986, what would *1296 your estimate of value be of the property prior to the taking? (Emphasis added).
A: The five hundred dollars per acre.
Q: And that is true also in 1987 and 1988, and 1989?
A: Yes.
Q: And thereafter, I gather?
A: Yes.
Q: Foreseeable future?
A: Yes.
Q: So, I guess in truth and in fact your actual opinion of the value of the property in 1986, was up to and including the foreseeabletoday, and the foreseeable future after that is that it is worth five hundred dollars an acre?
A: If it is jurisdictional wetland?
Q: Yes.
A: And a 404 permit cannot be obtained?
Q: No, I did not say can't be obtained, I said we don't know whether they can be obtained or not, but we do know they were denied in 1979.
A: Speculate on whether they could be obtained?
Q: Yes, we don't know.
A: Then it is five hundred dollars per acre....
Q: So, the mere fact that you don't have a permit in hand, makes it speculative and only worth five hundred dollars an acre prior to the taking, is that correct?
A: Yes.
Richard F. Brewster testified he could not give a value for wetlands property if he had to make the assumption that he did not know whether a permit could be obtained or not. At the same time, however, Brewster testified that the property was worth only $500 an acre in 1979 and thereafter because of the Corps' denial of BDF's permit application.
Q: [T]aking into consideration a denial of a permit on this property in 1979, it's your opinion that that property was thereafter worth five hundred dollars an acre, is that correct?
A: Assuming a denial of permit at any point in time, the property in my opinion would be five hundred dollars an acre from that point in time, no matter where you are.
Q: So, after 1979, thisand the permit was denied thereafter, up to and including 1989, this property is only worth five hundred dollars an acre, is that correct?
A: Take it as far as you want to go.
Q: So, as far as 1989, it's only worth five hundred an acre. 1986, it is only worth five hundred dollars an acre. And for the foreseeable future, it is only worth five hundred dollars an acre. And that is as a result of the denial of the permit in 1979?
A: Yes.
....
Q: So then until something different happens, it is still worth five hundred dollars an acre, is that what you're telling me? From '79 on until it becomes permittable, it is only worth five hundred dollars an acre? Until it receives a permit, it is only worth five hundred dollars an acre?
A: Basically, yes.[52]
Irvington Eppling, one of the District's two appraisers, testified as follows regarding the value of wetlands property where the purchaser does not know whether or not he will be able to obtain a permit.
A: I'm saying that based on my research of the denials and approvals of the Corps of Engineers 404 applications in the marketing area, this property could be in that, the probability of that property being permittable in the near future is not there and this would be reflected in the market. People are not buying those properties at this point. They have not been marketed. People have not marketed these probably in the last ten years or so, ever since the *1297 wetlands, the Clear Water Act came out and Clean Water Act came out, there's been a lot of problems with marginal properties that have 404 classifications on them. Nobody wants to buy them.
Q: In their unpermitted states?
A: People will take options and if they can get a permit, you might find no sales, but there are no sales out there. I looked and looked and looked.
This court is constrained not only by the record but also by La.R.S. 47:2321 which defines "fair market value" as:
the price for property which would be agreed upon between a willing and informed buyer and a willing and informed seller under usual and ordinary circumstances; it shall be the highest price estimated in terms of money which property will bring if exposed for sale on the open market with reasonable time allowed to find a purchaser who is buying with knowledge of all the uses and purposes to which the property is best adapted and for which it can be legally used.
According to the evidence in this case, the value of unpermitted wetlands to a purchaser who does not know whether or not he will be able to obtain a § 404 permit is $550.00 per acre.

B. Severance Damages
La.R.S. 38:387 provides a landowner can recover severance damages, or damages to that portion of his property which was not expropriated, "on a basis of immediately before and immediately after the expropriation taking into consideration the effects of the completion of the project in the manner proposed or planned." This statutory provision codifies preexisting law. In Bitterwolf, supra, 415 So.2d at 200, this court stated:
The Louisiana courts since 1889 have compensated for severance damages according to a "before and after" test under which the measure is the diminution in the value of the remaining property caused by the taking. McMahon v. St. Louis A. & T. R.R., 41 La.Ann. 827, 829-30, 6 So. 640, 641 (1889); M. Dakin & M. Klein, Eminent Domain in Louisiana pp. 70-73 (1970, Supp.1978); Tate, Legal Criteria of Damages and BenefitsThe Measurement of TakingCaused Damages to Untaken Property, 31 La.L.Rev. 431, 433 (1971).
Thus, where a tract of land is only partially expropriated, if there is damage to the remainder, compensation for that damage can be awarded to the landowner in addition to the award for the land actually expropriated. The burden of proving severance damages is on the landowner. Trippeer, supra, 276 So.2d at 320. Severance damages must be shown to a reasonable certainty and must not be too remote or speculative, for the mere possibility of severance damages is an insufficient basis for an award. State, Through Department of Transportation and Development v. Townsend, 473 So.2d 99, 102 (La. App. 3d Cir.), writ denied, 477 So.2d 712 (1985).
BDF needed to build a levee along alignment D in order to protect the remaining land from hurricanes and flooding. Section 404 and § 10 permits were necessary to construct this levee as well as to develop the remaining wetlands once the levee was constructed. BDF did not have the necessary permits for development at the time of the expropriation. All of their land was therefore undevelopable, unprotected wetlands. The landowners have been unable to prove their inability to obtain the permits, resulting in devaluation of the land, was caused by the hurricane project. The landowners have also failed to prove that, assuming there was no expropriation, they had a reasonable probability in the reasonably near future of obtaining the necessary permits for construction of a levee. Therefore, immediately prior to the expropriation, the wetlands which were later expropriated as well as the remaining wetlands of landowners' property had a nominal value of $550 per acre. After the expropriation and after the hurricane levee is constructed, the landowners' remaining wetlands will be on the unprotected side of the levee and will therefore remain undevelopable, still having only a nominal value of $500 to $550 per acre. Because there has been no diminution in value to the landowners' remaining, unexpropriated land, no severance damages are due. The trial court erred in awarding *1298 severance damages, and the court of appeal erred in affirming this award.

C. Delay Damages
The trial court held that "a property owner is entitled to recover delay damages as part of the just compensation." Then, finding the landowners had suffered a substantial delay since the date BDF's permit application was denied by the Corps in 1979, the trial judge awarded "delay damages" from that time at a rate of 10% per year calculated on the value of the property as of the date the delay began. The court of appeal, holding that BDF's development was stopped by the cease and desist order issued by and denial of BDF's permit made by the Corps, agreed that there had been a delay of the development, and that but for the Corps' cease and desist order, the landowners had a reasonable expectation of completing their development as planned. The court of appeal went on, however, to hold the District responsible for this delay only from September 11, 1985, the date the District acquired responsibility for the construction of the hurricane levee.
The District's delay in taking action from the time it obtained the permit from the Corps for the construction of a levee along alignment E in 1985 until the time it actually filed the instant expropriation suits in 1989 did not cause the landowners any damage. During that time the landowners were already prohibited from developing their land, not by the above delay of the District, but by the existence of a cease and desist order issued by the Corps prohibiting such development and by the landowners' lack of the permits legally required for the construction of a levee on alignment D and for the land's development. As explained earlier, the landowners have been unable to prove these two facts were in any way related to the existence of the hurricane levee project. Therefore, because it was not the District's delay which prevented the landowners from developing their property, the landowners are not entitled to delay damages in their suit against the District. The trial court erred in awarding such damages, and the court of appeal erred in affirming, as amended, this award.

D. Attorney's Fees
La.R.S. 38:387(E) provides:
Reasonable attorney's fees may be awarded by the court if the amount of the compensation deposited in the registry of the court is less than the amount of compensation awarded in the judgment. Such attorney's fees in no event shall exceed twenty-five percent of the difference between the award and the amount deposited in the registry of the court.
The District did not assign as error the award of attorney's fees to this court or to the court of appeal. Had this court simply affirmed the award of compensation due, we would have been required to address the issue of whether or not this court could review the award of attorney's fees, even though not argued on appeal by the District, in light of this court's inherent authority and responsibility to regulate the practice of law and to enforce the Rules of Professional Conduct, specifically Rule 1.5(a).[53] Because we have greatly reduced the award of compensation, however, and because the award of attorney's fees by statute turns on a percentage of the difference between the amount deposited in the registry of the court and the amount of compensation awarded in this judgment, we must of necessity amend the award of attorney's fees also.
In State, Department of Transportation and Development v. Williamson, 597 So.2d 439 (La.1992), this court listed the following factors as those to be taken into consideration in an expropriation case when determining the reasonableness of attorney's fees:
(1) the ultimate result obtained; (2) the responsibility incurred; (3) the importance of the litigation; (4) amount of money involved; (5) extent and character of the work performed; (6) legal knowledge, attainment, and skill of the attorneys; (7) number of appearances made; (8) intricacies *1299 of the facts involved; (9) diligence and skill of counsel; and (10) the court's own knowledge.
As the trial judge noted, this case involved complex legal issues requiring extensive preparation and discovery. On remand, in the unlikely event the amount deposited in the registry of the court is less than the amount awarded in the judgment, the trial judge is directed to award attorney's fees in the amount of 25% of the difference between the amounts.

VII. CONCLUSION
Based on the foregoing, BDF, Coast Quality, and the Isaacs are entitled to $550.00 per acre for that portion of their land which was unpermitted wetlands at the time of the expropriation. A small portion of the property expropriated from BDF consisted of "highlands" which do not require Corps permits for development. It appears from the record the District properly deposited compensation for BDF's highland acreage based on a valuation of $23,000.00 to $25,000.00 per acre. The adequacy of the District's deposit as regards the highland acreage does not appear to be disputed by BDF herein.
The District deposited $213,206.00, $24,726.00, and $13,058.00 into the registry of the court for its suits against BDF, the Isaacs, and Coast Quality Construction Corporation, respectively. Inasmuch as the orders of expropriation and the District's appraisals upon which the deposits were based are at odds with each other in some instances relative to the exact amount of acreage expropriated in each tract, we must remand to the trial court for computation of the total amount due the landowners. On remand, the trial judge is directed to determine the correct amount of acreage expropriated in each parcel, to compute the total amount of compensation due the landowners based on the above values, to deduct those amounts which the District deposited into the registry of the court, to award attorney's fees and interest on the resulting amounts where appropriate, and to render judgment accordingly.[54]
REVERSED AND REMANDED.
CALOGERO, Chief Justice, dissenting from denial of rehearing.
I would grant this rehearing application in order to reconsider the opinion and result in this case. I now believe that our original disposition took much too narrow a view; *1300 that it did not respect the 1974 constitutional provision ("In every expropriation ... the owner shall be compensated to the full extent of his loss"), which this Court has repeatedly said has given our citizens greater rights regarding compensation for property taken than existed before 1974; that the Court has applied a wrong standard in holding that a prospective use of the property cannot affect its value unless there is a reasonable probability that it may be so used in the future; that the Court has additionally erred in holding that Article 1, Section 4 does not apply because this expropriation is akin to an appropriation of a levee servitude.
In my view the Court was not incorrect in its essential determination that the unpermitted property should not be valued as developable residential property. On the other hand, just prior to the Levee District's choosing alignment E and filing the expropriation this property had a value which was clearly in excess of that ascribable to pure and simple wetlands.
The Court was led into an erroneous result by accentuating the need on the part of the landowners to prove that a reasonable probability existed regarding a prospective use of the property for residential purposes. In my view there was need only for a reasonable possibility of such, in order to establish that the property had an investment value beyond that of undevelopable wetlands. More explicit reasons on this matter of reasonable probability versus reasonable possibility, as well as regarding the applicability of Article 1, Section 4, and additional considerations bearing on why I would grant a rehearing, follow:
I. The Court on original hearing adopted too strict a standard when it decided that a prospective use was valueless absent a "reasonable probability" that the landowners would actually receive a permit
It is well-established that the proper compensation for a taking is the "best and highest use" to which the land could have been put at the time of the expropriation. State, Dept. of Highways v. Rapier, 246 La. 150, 164 So.2d 280 (1964). This includes the value accorded to certain prospective uses, following from the landowner's constitutional "right of ownership to use and enjoy (his) land by developing it as (he) may choose, including residentially." State Through DOTD v. Chambers Inv. Co., 595 So.2d 598, 604 (La.1992). The Court's opinion applies throughout this case the standard of "reasonable probability" to demonstrate the prospective "best and highest use" of the property. In this case, the Court has held that the landowners have failed to show a "reasonable probability" that they could or would obtain the permits necessary to develop their property at the time of the expropriation. This is far too harsh a standard; the proper inquiry should be whether there was a "reasonable possibility" of obtaining the permits, or, stated another way, whether the possibility of obtaining the permits was significant enough to induce a reasonable buyer to allow some premium for that possibility.[1]
In support of their "reasonable probability" standard, the Court cites no Louisiana cases, nor any Louisiana statutory or constitutional authority. Rather, it cites a United States Fifth Circuit decision, United States v. Land, 62.50 Acres of Land More or Less, 953 F.2d 886, 890 (5th Cir.1992), which in turn cites United States v. 841 Acres of Land, Etc., 680 F.2d 388, 394-395 (5th Cir.1982), which in turn cites a 1934 United States Supreme Court decision, Olson v. United States, 292 U.S. 246, 253-258, 54 S.Ct. 704, 708-709, 78 L.Ed. 1236 (1934). Olson, the watershed federal decision concerning the "best and highest use" doctrine, in fact declared, while passing on the particular facts before the Court, that
[t]here must be a reasonable possibility that the owner could use his tract together with the other shorelands for reservoir purposes or that another could acquire all lands or easements necessary for that use. *1301 Id., at 256-257, 54 S.Ct. at 709, 78 L.Ed. at 1245. See also Miss. & Rum River Boom Co. v. Patterson, 98 U.S. 403, 25 L.Ed. 206 (1879).
The Court's opinion cites four treatises in support of their "reasonable probability" standard. However, those authored by Orgel[2] and Nichols,[3] as well as American Jurisprudence (2d Series), do not deal specifically with Louisiana law. In Dakin and Klein's treatise,[4] which treats only Louisiana law, the following appears:
If a zoning ordinance exists which limits the uses to which land taken in an expropriation proceeding may be put, a use excluded by such an ordinance may not serve as a basis of valuation, since the land would not be available for such use. However, if there is a reasonable possibility that the zoning classification will be changed to allow a particular use, this possibility should be considered.
Dakin & Klein, supra, at 179 (emphasis in original). This standard of looking to the reasonable possibility of the "best and highest use" to which property may be put, as a factor in determining compensable value, accords with Louisiana jurisprudence. "These same authorities hold that where there is a reasonable possibility of change to a higher zoning classification, said higher classification may be employed as the best and highest use of condemned property for purposes of evaluation." State Dep't of Hwys. v. St. Tammany Homestead Ass'n, 304 So.2d 765, 772 (La. App. 1 Cir.1974). See also Plaquemines Parish School Board v. Miller, 222 La. 584, 63 So.2d 6, 8 (1953); State Dep't of Highways v. Cangelosi, 290 So.2d 806, 808 (La.App. 1 Cir.1974); City of Monroe v. Nastasi, 175 So.2d 681, 683 (La.App. 2 Cir.1965); City of Monroe v. Carso, 179 So.2d 696, 697 (La.App. 2 Cir.1965); Gulf States Utilities Co. v. Wright, 195 So.2d 663, 669 (La.App. 1 Cir. 1967); Recreation & P. Com'n Par. of E. Baton Rouge v. Loret, 263 So.2d 467, 472 (La.App. 1 Cir.1972); State, Dept. of Transp. & Development v. Davis, 394 So.2d 641, 643 (La.App. 1 Cir.1980); City of New Orleans v. McKendrick, 485 So.2d 653, 655 (La.App. 4 Cir.1986).[5]
The key difference which emerges in the jurisprudence is not that between a "reasonable probability" and a "reasonable possibility," but rather that between a "remote possibility" and a "reasonable possibility." See Louisiana Highway Com'n v. Guidry, 176 La. 389, 146 So. 1, 5 (1933). In West Jefferson Levee Dist. v. Mayronne, 595 So.2d 672, 679 (La.App. 5 Cir.1992), the Fifth Circuit affirmed a decision in which an expropriated landowner's property value was enhanced by the jury finding that his property "would have been permittable in 1987 despite its high-quality wetlands." In Burdin v. Board of Com'r, 533 So.2d 977, 981 (La.App. 3 Cir. 1988), the Third Circuit found that despite the fact that "bringing the property in conformity with parish and local ordinances would involve some expense," there existed a reasonable possibility of attaining the prospective "best and highest use." This is in accord with the principle that the "specific plans of businesses and individuals" do bear upon the possible fruition of prospective uses of the land. Louisiana Resources Co. v. Noel, 499 So.2d 1016, 1019 (La.App. 3 Cir. 1986).
It should be remembered that the reasonable possibility of a particular use of the land is merely a factor to be considered in the determination of the land's fair market value. In this case, however, the Court's opinion has severed consideration of any potential uses (although they may influence the market price) which do not rise to the level of a probability, which is really a preponderance, i.e. more likely than not to come to pass. This approach does not reflect the realities of the modern real estate market, where speculators *1302 are willing to take greater or lesser risks dependent upon the investment potential of the involved property, and to offer concomitant premiums based upon that balancing of degree of risk and potential payoff. Recent jurisprudence of the Federal Circuit Court of Appeals[6] has noted that "[a] speculative market may exist in land that is regulated as well as in land that is not, and the precise content of regulations at any given time may not be particularly important to those active in the market." Florida Rock Industries v. United States (Florida Rock IV), 18 F.3d 1560, 1566 (Fed.Cir.1994). See also Loveladies Harbor, Inc. v. United States (Loveladies Harbor II), 28 F.3d 1171 (Fed. Cir.1994).
The limitation which the Court's opinion places upon the factors which may go into the calculation of a property's "fair market value" is a departure from the prior jurisprudence of this state and the very recent Florida Rock and Loveladies Harbor cases out of the Federal Circuit, as well as the spirit of Article I, Section 4 of the Constitution of 1974, and should be reconsidered.
II. The Court on original hearing erroneously concluded that Article I, Section 4 of the Louisiana Constitution does not apply to this case
The last sentence of Article I, Section 4 of the Louisiana Constitution of 1974 ("Right to Property"), which follows a paragraph regarding compensation for expropriated property, reads as follows: "This Section shall not apply to appropriation of property necessary for levee and levee drainage purposes." La. Const. Art. I, Sec. 4 (emphasis added). The Court cites this clause in support of their proposition that "[b]ecause we are dealing with an expropriation of property by the West Jefferson Levee District to be used to construct a levee, Article 1, Section 4 does not apply." Court Opinion, P. 1271. Instead, the Court maintains that Article 6 ("Local Government"), Section 42 ("Compensation for Property Used or Destroyed; Tax"), which deals with the use or destruction of lands appropriated for levee or levee drainage purposes, and the statutory scheme passed to implement Article 6, Section 42 (See LSA-R.S. 38:301 et seq.), govern this case. See also LSA-R.S. 9:5626.
The Court does not consider, however, the difference between a Louisiana landowner's protection against "appropriation of property necessary for levee and levee drainage purposes," which is excepted from the protections of Article I, Section 4, and expropriation for any lawful purpose. The difference between appropriation for levee purposes and expropriation arises from the particular nature of the levee servitude and the way in which it was traditionally exercised by public bodies:
The ownership of the lands used or destroyed for levee purposes remained in the riparian landowner, because the lands were not `expropriated' but merely `appropriated' for levee construction and the payment (authorized under the Constitution of 1921) was an indemnity for the public use.
Yiannopoulus, Civil Law Treatise (Property), V. 2, Section 88, P. 190 (3d ed. 1991). Appropriation, as opposed to expropriation, is carried out by a resolution of the appropriating authority, without the need for a judicial proceeding. See Richardson & Bass v. Board of Levee Commissioners, 226 La. 761, 77 So.2d 32 (1954). Furthermore, "[a]ppropriation involves the taking of a servitude, whereas expropriation may involve the taking of ownership." Yiannopoulus, supra, at 190 n. 20. See also Delaune v. City of Kenner, 550 So.2d 1386 (La.App. 5 Cir.1989), writ denied, 553 So.2d 475 (La.1989).
In this case, there is no doubt that expropriation, as opposed to appropriation, is the vehicle by which the Levee District acquired the landowners' property. The "taking" was *1303 perpetrated under the authority of the following statute:
... whenever any levee district or levee and drainage district cannot appropriate or amicably acquire immovable property needed for levee purposes, including but not limited to flooding and hurricane protection purposes, the levee district or levee and drainage district may acquire the property by expropriation prior to judgement in accordance with the provisions of this Part. The method of expropriation provided by this Part shall be authorized for corporeal property and servitudes and for both riparian and nonriparian property.
LSA-R.S. 38:351 (emphasis added). In Paragraph 10 of its Petition For Expropriation, the Levee District states that "it is necessary for the District to expropriate in full ownership" the landowners' property. Record, V. I, P. 3 (emphasis added). Furthermore, it should be noted that the lands involved in the instant case are probably not even subject to the levee servitude, which only burdens those lands which abut navigable waterways at the time of separation from the sovereign. See Board of Com'rs of Atchafalaya Basin Levee Dist. v. Percle, 535 So.2d 1240 (La.App. 3 Cir.1988), writ denied, 537 So.2d 1171 (La.1989).
Exception must be taken to the Court's apparent holding that the term "appropriation" in the final sentence of Article I, Section 4, includes the separate and distinct concept of "expropriation" under its aegis.[7] The word "appropriation" in Article I, Section 4 of the Louisiana Constitution of 1974 is a legal term of art which has a meaning rooted in the jurisprudence and historical practice. In addition, the legislature has recognized this distinction, providing an alternative mechanism of "expropriation" for Levee Districts unable to satisfy their legal duties by "appropriation." In this case, the landowners' lands were expropriated, and they were therefore entitled to the full protection of Article I, Section 4 of our Constitution.
It is important for this Court to enunciate the proper legal standard, since the compensation provided under Article 6, Section 42, and the statutory scheme enacted pursuant to it, is in many ways merely a "gratuity" provided by the Legislature to indemnify the aggrieved landowner, and as such may be susceptible to strict construction. Article I, Section 4, is quite a different matter, as "[t]he history of Section 4 reveals a desire to increase the level of compensation beyond that provided by existing state law" and "to give citizens more rights." Lee Hargrave, The Declaration of Rights of the Louisiana Constitution of 1974, 35 La.L.Rev. 1, 15, 17 (1974). Accord, State, DOTD v. Dietrich, 555 So.2d 1355 (La.1990). The provision "clearly repudiates the traditional public policy argument that a landowner may be required to suffer financially in order to encourage public improvements." Allen Crigler, Expropriation: Compensating the Landowner to the Full Extent of His Loss, 40 La.L.Rev. 817, 826 (1980). See also State Through Dept. of Highways v. Constant, 369 So.2d 699 (La. 1979).

III. Additional Considerations
The Court, applying LSA-R.S. 38:387(A),[8] held that "this court should not consider any increase in value the property would have had in the future had the expropriating entity chosen to locate its improvement somewhere more beneficial to the landowners." Court Opinion, P. 1276. The "improvement" referred to by the Court is the construction of the levee along Alignment D, which would have preserved the landowners' opportunity to develop their property. The Court went on to apply this legal precept to the facts of the case:
[T]his court should not consider any increase in value the property would have had in the future had the expropriating *1304 entity chosen to locate its improvement somewhere more beneficial to the landowners. That the landowners' land would be developable and valuable if the District had built its hurricane protection levee along Alignment D does not meet the landowners' burden of proving their land was developable and valuable prior to the District's acceptance of the permit along alignment E and its expropriation of land thereafter.
* * * * * *
Instead, the landowners have to show their property was valuable at the time of the expropriation without any increase in value attributable to the benefits which would flow to the property as a result of the proposed improvement, regardless of where it is to be placed.
Court Opinion, P. 1276.
As legal support for this proposition the Court cites State Dept. of Highways v. Bitterwolf, 415 So.2d 196 (La.1982). The Court relies upon Bitterwolf for the notion that "any change in market value caused by (a) proposed improvement, be it a decrease or an increase, shall be disregarded when determining market value and compensation." Court Opinion, P. 1276. Bitterwolf, however, merely stands for the proposition that the state does not have to pay, when expropriating, for any enhanced value of the land that results from the prospect of the activity for which the expropriation is undertaken after the final decision to proceed with that activity has been made. Bitterwolf, supra, at 199-200. The key moment in the instant case, however, is the moment before the state activity, the Levee District's expropriation, occurred. The Court therefore improperly excluded consideration of the effect that the reasonable possibility of the Levee District choosing Alignment D might have had upon the price a reasonable buyer in the market (for investment property) would have been willing to pay.
This point is more fully explained by the following language from Shreveport Traction Co. v. Svara, 133 La. 900, 63 So. 396 (1913), quoted in Bitterwolf, 415 So.2d at 197-198:
[T]he public at large, or particular individuals, may hold an enterprise, which, within the meaning of the law, is regarded as public improvement in contemplation for generations, only, in the end, to abandon the idea, whilst the property to be affected by it is, in the meanwhile, on the market, and is bought and sold at prices which vary as the prospect that the improvement will be made, or will be abandoned, becomes, in the opinions of the buyers and sellers, imminent or remote. In other words, the possibility or probability, that some improvement affecting particular property will, or will not, be made, and, if made, when, and with what effect, are commonplace factors, which, with others, determine, from time to time, the market value of such property.

Svara, supra, 63 So. at 398-399 (emphasis added.)
Until the Levee District decided that the levee was to be built along Alignment E and filed its petition for expropriation, there was a distinct and not unreasonable possibility that Alignment D might have been chosen as the levee location.[9] At that time a variety of possibilities existed (the more prominent ones being Alignment D and E), regarding both the placement of the levee and the possibility of future attainment of a permit, and both lower courts felt that such possibilities were reasonably held. To the extent that these factors impacted the fair market price a reasonable buyer would have paid for the property, they should have been considered. The Court's decision to exclude these factors from such consideration was an improper extension of Bitterwolf given clearly contrary language in Svara, supra.
*1305 The market value of this property was as an investment, which the Florida Rock and Loveladies Harbor cases teach us is a relevant and appropriate consideration in valuing expropriated property. This investment potential was not examined in the opinion, nor apparently by the landowners at trial. The "fair market value" of the land in my view is affected by potential uses and should at the least warrant a premium over its wetlands value. See Erich Sternberg Realty v. Tax Com'n, 560 So.2d 868, 880 (La.App. 1 Cir. 1990) ("fair market value" conveys a "future subjunctive" tense, e.g. the price which "would be agreed" on).[10] Although the lower courts may have over-assessed the impact of the potential residential use by valuing the property not at a premium over the base wetlands value, but as though it were permitted and thus developable residential property, those courts nonetheless found, and properly in my opinion, that a reasonable possibility of future permitting and/or other potential development existed at the time of expropriation. This was a factual finding with which we should be loathe to disagree, considering the deference regarding factual determinations which this Court so frequently espouses.
The just, and constitutional, solution in this case would be to compensate these landowners to the full extent of their loss, given their substantial investment, by having their property valued at a premium over the base wetlands value according to its investment potential at the time just preceding the expropriation. The only question is whether or not this record as constituted would support an intermediate evaluation based largely on logic and common sense, or whether this Court should do justice, rather, by ordering a retrial on the issue of fair market value.
Writs were granted originally in this case because it appeared that the judgments of the lower courts overvalued the property as currently developable residential ($21,000 per acre) and that any value but for wetlands was not supported by the law. Our studied review agreed with the conclusion that the property should not be valued as developable residential, notwithstanding it was evident the fair market value surely exceeded $500 per acre. With twenty odd years having passed since the property was acquired for between $2,000 and $3,000 per acre, the value of the property as investment, not as developable residential property, was the evident answer to a just resolution, one which is less than the award of the district court as reduced by the court of appeal. That just resolution, the Levee District contends, is barred by the absence from the record of any expert testimony supporting any value other than $21,000 per acre for residential and $500 to $550 per acre for wetlands property.
This Court has both the right and the duty to remand the case for retrial or supplemental hearing when it becomes necessary to introduce additional evidence in order to prevent a miscarriage of justice. See LSA-C.C.P. Art. 2164; Huval Baking v. Workers' Comp. Bd., 594 So.2d 1028 (La.App. 3 Cir. 1992); St. Pierre v. Hirschfeld, 569 So.2d 222 (La.App. 1 Cir.1990); Geigy Chemical Corp. v. Rada, 264 So.2d 279 (La.App. 4 Cir.1972). That is what this Court should do in this case. In the process we would be respecting the constitutional command and the rights of the landowners who are entitled to reimbursement "to the full extent of (their) loss."
NOTES
[*] Watson, J., recused.
[1] This amount apparently includes approximately $500,000 in closing costs.
[2] Regent Development Corporation is not a party to this suit.

Unless otherwise specified, BDF, the Isaacs, and Coast Quality Construction Co. are hereinafter referred to as the "landowners".
[3] Wilson P. Abraham, an original investor in BDF, testified that BDF paid $7,161,200.00 for the 2182.61 acres it purchased in 1972. On cross examination, he testified that during the 1970s, BDF sold several parcels from the acreage it had originally purchased, except for the land remaining at issue in this case, and that total gross proceeds from these sales were over $9,000,000.00. This amount included BDF's sales to Regent Development Corp., Charalex Lands Inc., and the Isaacs.
[4] It is beyond dispute that almost all of landowners' land at issue herein was, and is now, wetlands subject to the jurisdiction of the Corps under these Acts.
[5] In February of 1974, BDF dedicated to Jefferson Parish its completed improvements.
[6] It is undisputed that a levee protecting the landowners' land is necessary for the development of the land into residential subdivisions.
[7] An internal memorandum of the Corps filed into evidence in this case by landowners states that by December of 1975, there was "sufficient information available ... to support a recommendation for denial without preparing the final EIS."
[8] In addition to the Barataria Marsh Unit located in Jefferson Parish, the Jean Lafitte National Historical Park also includes:

(2) the area known as Big Oak Island; (3) an area or areas within the French Quarter section of the city of New Orleans as may be designated by the Secretary of the Interior for an interpretive and administrative facility; (4) folk life centers to be established in the Acadian region; (5) the Chalmette National Historical Park; and (6) such additional natural, cultural, and historical resources in the French Quarter and Garden District of New Orleans, forts in the delta region, plantations, and Acadian towns and villages in the Saint Martinville area and such other areas and sites as are subject to cooperative agreements in accordance with the provisions of this part.
16 U.S.C. § 230.
[9] Subsection (f) of 16 U.S.C. § 230a provides:

The Secretary may revise the boundaries of the park protection zone, notwithstanding any other provision of law, to include or exclude properties, but only with the consent of Jefferson Parish.
[10] On May 9, 1984, the Jefferson Parish Council passed a resolution wherein it refused to agree to the establishment of regulations for the park protection zone without a promise of indemnity from the federal government because of the possibility of exposing the parish to liability for regulatory takings resulting from enforcement of the regulations.
[11] Bayou Des Families Dev. Corp. v. United States Corps of Engineers, 541 F.Supp. 1025 (E.D.La. 1982). Specifically, the federal district court stated:

Plaintiff's claim that the failure to place a flood control levee where plaintiff would like it to be does not create a justiciable case or controversy ripe for review.
In 1974 Congress amended the Flood Control Act to require the Corps, in formulating flood control plans, to employ the most economically, socially, and environmentally acceptable means of reducing or preventing flood damages. Even if the Corps did, in mid-1972, propose an alignment similar to that along which plaintiff later began construction of a levee, the Corps was not bound by that proposal.
The Corps was, however, required to take subsequently enacted federal legislation, including the FWPCA, the amendment to the Flood Control Act, and the Park Act and regulations, into account in developing a proposal for hurricane protection on the West Bank. Even if the 1972 proposal had passed an earlier cost-benefit analysis, the Corps could not ignore the Congressional policies expressed in subsequent legislation. Thus, the Corps has properly considered subsequent legislation, specifically that legislation relating to environmental protection and to establishment of Jean Lafitte Park, in developing a flood control proposal for the West Bank.
Development of recommendations for flood control projects is entrusted to the Corps' discretion. However, the only body with authority to make a final determination as to whether or where a flood control project will be funded and built is Congress.
Id. at 1041-42 (citations omitted).
[12] The mere authorization of a project for funding by the Corps does not mean the federal money immediately becomes available at that time. Under 33 U.S.C. § 2213(j), the local sponsor must enter into a cost-sharing "agreement" with the Secretary of the Army before any project can be initiated. This was not done herein until December of 1990.
[13] Although it is not clear, the amount of compensation the District deposited appears to be based on a valuation of approximately $550.00 per acre for wetlands, $550.00 per acre less varying amounts for servitude-burdened wetlands, and $23,000.00 to $25,000.00 per acre for BDF's non-wetlands, "highland" acreage.
[14] The District filed various exceptions which were denied by the trial court and which denials were not appealed herein.
[15] Bayou Des Families Development Corporation, Coast Quality Construction Corporation, and Betty Jane Perrin, Wife of/and Ronald J. Isaac v. The United States of America, No. 91-13151, (U.S. Claims Court, filed July 25, 1991). The petition in that case was filed into evidence by the District.
[16] The trial judge awarded costs of $136,305.35 to BDF, $16,480.00 to Coast Quality, and $17,370.63 to the Isaacs. The trial judge also awarded interest on the judgment, calculated on the difference between the sums deposited into the registry of the court and the amounts awarded in the expropriation suits, from the date the District deposited funds into the registry of the court.
[17] West Jefferson Levee District v. Coast Quality Const. Corp., 620 So.2d 319 (La.App. 5th Cir. 1993).
[18] The total amount of the judgment was not computed by the court of appeal.
[19] 629 So.2d 372 (La.1993).
[20] The 1974 Constitution changed the law on compensation for takings by newly providing "the owner shall be compensated to the full extent of his loss." In State, Dept. of Transp. and Dev. v. Dietrich, 555 So.2d 1355, 1358 (La.1990) (citations and footnotes omitted), this court explained the significance of the new language:

In 1974, the Louisiana Constitution was reworded to provide that an "owner shall be compensated to the full extent of his loss" when land is expropriated by the state. Previously, a landowner could only receive the fair market value and any severance damages for property taken through expropriation. The change permits a landowner to remain in an equivalent financial position to that which he enjoyed before the taking....
Article 1, Section 4, does not specify how to fully compensate a landowner whose property is taken. Delegates to the Constitutional Convention explained that full compensation should include moving costs, costs to relocate, inconvenience, and loss of profits from takings of business premises. Where economic losses suffered by a business have been proven, damages for incidental and consequential loss must be awarded to fully compensate the owner. Article 1, Section 4, provides that the landowner should be compensated for "his loss" not merely the loss of the land.
See also State Through Dept. of Highways v. Constant, 369 So.2d 699, 701 (La.1979):
[T]he new constitutional language "has broadened the measure of damages in expropriation cases by requiring that an owner not only be paid the market value of property taken and severance damages to his remainder, but also that such an owner be put in as good a position pecuniarily as he would have been had his property not been taken."
See also State Through Dept. of Highways v. Bitterwolf, 415 So.2d 196, 199 (La.1982).
[21] While the Louisiana Constitution is specifically inapplicable to this expropriation, the United States Constitution still applies. Although not explicitly stated therein, the Fourteenth Amendment has been held to require a state pay "just compensation" where property has been taken for public use. Appleby v. Buffalo, 221 U.S. 524, 31 S.Ct. 699, 55 L.Ed. 838 (1911).
[22] In its petition for expropriation, the District must include an "itemized statement of the amount of money estimated to be the full extent of the owner's loss for the expropriation or the damage, or both, as the case may be." La.R.S. 38:352(3)(b). Upon the deposit of this estimated amount into the registry of the court, the "title to the property and the property rights specified in the petition shall vest in the levee district, and the right to just and adequate compensation therefor shall vest in the persons entitled thereto." La.R.S. 38:355.
[23] La.R.S. 47:2323.C. provides:

The fair market value of real and personal property shall be determined by the following generally recognized appraisal procedures: the market approach, the cost approach, and/or the income approach.
(1) In utilizing the market approach, the assessor shall use an appraisal technique in which the market value estimate is predicated upon prices paid in actual market transactions and current listings.
(2) In utilizing the cost approach, the assessor shall use a method in which the value of a property is derived by estimating the replacement or reproduction cost of the improvements; deducting therefrom the estimated depreciation; and then adding the market value of the land, if any.
(3) In utilizing the income approach, the assessor shall use an appraisal technique in which the anticipated net income is processed to indicate the capital amount of the investment which produces the net income.
The jurisprudence has generally held that the "market approach," or the use of comparable sales in the vicinity of the land sought to be expropriated, is the primary tool of analysis of fair market value because it is, in most cases, likely to produce more accurate results. State, Dept. of Highways v. Crow, 286 So.2d 353, 356 (La.1973); Parish of Iberia v. Cook, 238 La. 697, 116 So.2d 491, 495 (1959); State, Dept. of Transp. and Dev. v. Winn, 463 So.2d 648, 651 (La.App. 4th Cir.1985) ("In cases of expropriation, the more reliable and approved method for determining the fair market value of the property taken is to consider comparable sales, adjusting them to compensate for their relative bad and good features with regard to the expropriated property."); State, Through Dept. of Highways v. Rosenblum, 344 So.2d 424, 425 (La.App. 1st Cir. 1977).
[24] "Potential uses must overcome a presumption in favor of the existing use. A landowner can overcome this presumption only by showing a reasonable probability that the land is adaptable and needed for the potential use in the near future." U.S. v. Land, 62.50 Acres of Land More or Less, Situated in Jefferson Parish, State of La., 953 F.2d 886, 890 (5th Cir.1992).
[25] See, e.g., Winn, supra, 463 So.2d at 650 (quoting State, Dept. of Transp. and Dev. v. Goldsby, 427 So.2d 580, 581-82 (La.App. 5th Cir.1983) ("The use of land considered in determining market value must be one which has a bearing on the market value at the time of the taking, and one which would be considered by a willing buyer as affecting the market value.").
[26] In L. Orgel, Valuation Under The Law of Eminent Domain § 31 at 153 (1953), the reason for excluding speculative and remote uses from a consideration of fair market value is explained as follows:

[W]hen the courts warn a jury against the acceptance of "speculative values," they apparently mean merely to prevent it from taking witnesses' predictions as if they were realities, and against failure to apply the same rigorous discount for risk that is assumed to be applied by actual buyers who must back their estimates of probabilities with their own hard cash.
[27] See also Plaquemines Parish School Board v. Miller, 222 La. 584, 63 So.2d 6, 8 (1953):

Whilst the fact that a piece of property may, at some time, become available for residential subdivision purposes, can be taken into consideration in fixing its market value in expropriation proceedings, it should be made to appear that there is some reasonable expectation that it might be so developed in the not too far distant future. It will not do for the owner to say that at some indefinite time it is foreseeable that this property, because it adjoins a growing town, will have an added value as a subdivision project. A situation like that presents only a possibility of such use, and in Louisiana Highway Commission v. Guidry, 176 La. 389, 146 So. 1, it is stated that the "possibility" that land to be expropriated might sometime be sought for a particular purpose, was too remote to be considered as an element in determining its value.
See also State, Through Dept. of Highways v. Romano, 343 So.2d 222, 224 (La.App. 1st Cir. 1977) ("[W]here potential use is reasonably prospective, or reasonably certain to the extent that such use is removed from the realm of guesswork, speculation and conjecture, such potential use may be considered the best and highest use for fixing value in an expropriation proceeding.").
[28] Where there is no reasonable probability that a permit necessary for development could be obtained or that a zoning ordinance currently prohibiting development might be changed, the courts are prohibited from considering uses dependent on such changes because those uses would be illegal. An illegal use cannot be considered because it is highly speculative that such a use could be established and maintained. See L. Orgel, Valuation Under The Law of Eminent Domain § 34 at 164 (1953); and 27 Am Jur 2d Eminent Domain § 278.
[29] See also Land, 62.50 Acres, supra, 953 F.2d 886 (5th Cir.1992); Russo v. Town of East Hartford, 179 Conn. 250, 425 A.2d 1282 (1979), cert. denied, 445 U.S. 940, 100 S.Ct. 1334, 63 L.Ed.2d 773 (1980); Morgan v. City of Overland Park, 207 Kan. 188, 483 P.2d 1079 (1971); Budney v. Ives, 156 Conn. 83, 239 A.2d 482 (1968); Hietpas v. State, 24 Wis.2d 650, 130 N.W.2d 248 (1964); .040 Acres of Land v. State Highway Dept., 198 A.2d 7 (Del.Supr.1964).
[30] See also M. Dakin and M. Klein, Eminent Domain in Louisiana 179 (1970, Supp.1978) ("If a zoning ordinance exists which limits the uses to which land taken in an expropriation proceeding may be put, a use excluded by such an ordinance may not serve as a basis of valuation, since the land would not be available for such use. However, if there is a reasonable possibility that the zoning classification will be changed to allow a particular use, this possibility should be considered."); 27 Am Jur 2d Eminent Domain § 276 ("Ordinarily ... no compensation is allowable on account of an owner's hope or expectation of obtaining a license, permit or lease from public authorities. Likewise, it appears that the mere possibility that the condemnor may obtain some license or right from the state with respect to the property being condemned cannot be considered in determining compensation.") and § 277 ("[I]f a possible change in a zoning ordinance restricting the use of property condemned is purely speculative, such possibility is not to be considered."); 9 ALR3d 291, 309-326, Zoning as a Factor in Determination of Damages in Eminent Domain (1966); and G. Limerick, The Effect of Zoning on Valuation in Eminent Domain, 53 Ill.BarJ. 956, July 1965.
[31] Land, 62.50 Acres, supra, 953 F.2d at 890.
[32] Indeed, the entire burden of proving entitlement to any compensation beyond that deposited into the registry of the court by the expropriating entity rests on the landowner to establish his claims by a preponderance of the evidence. See, e.g., Dietrich, supra, 555 So.2d at 1359; State, Dept. of Highways v. McPherson, 261 La. 116, 259 So.2d 33, 38 (1972); Rapier, supra, 164 So.2d at 282 ("[T]he landowner bears the burden of proving his claim for additional compensation to a legal certainty and by a preponderance of the evidence."); State Through Dept. of Highways v. Levy, 242 La. 259, 136 So.2d 35, 43 (1961); State, Dept. of Transp. and Dev. v. Clark's Estate, 432 So.2d 405, 408 (La.App. 1st Cir.1983) ("The burden imposed upon the person having his property expropriated is to establish his claims to a legal certainty and by a reasonable preponderance of the evidence; speculation, conjecture, mere possibility and even unsupported probability are not sufficient to support a judgment."). The burden of proving entitlement to severance damages, State Through Dept. of Highways v. Trippeer Realty Corp., 276 So.2d 315, 320 (La. 1973), and other consequential damages, City of New Orleans v. Giraud, 238 La. 278, 115 So.2d 349, 352 (1959), also rests with the landowner.
[33] As explained earlier, regarding expropriations under La.R.S. 38:387, the requirement the landowner be compensated to the full extent of his loss is statutory, as found in La.R.S. 38:301.C.(1)(a), and is not constitutionally based.
[34] See also McLean v. Hunter, 495 So.2d 1298, 1304 (La.1986) (applying the foregoing principle to a jury's findings) ("When a jury is given incorrect instructions in the law ... no weight should be accorded the judgment of the trial court which implements the jury verdict.... In such situations the jury verdict is simply not entitled to a presumption of regularity.").
[35] Indeed, both of the appraisers specifically state as much in their appraisals.
[36] See the section titled "Valuation," infra, for landowners' appraisers' comments in this regard. The District's appraisers, Irvington Eppling and Peter Talluto, appraised the wetlands at $550.00 per acre and $500.00 per acre, respectively.
[37] The court of appeal perpetuated this error when it stated the District should be liable for the value of the land based on the assumption it was permitted and developable because the District "took action which forever foreclosed the possibility of development." All expropriations do this; but, this fact does not determine value. While the court of appeal seemed to use the correct analysis when it stated that until the expropriation, the "real possibility of a change in the landowners favor existed," it does not state upon what evidence this conclusion is based. Furthermore, the landowners must show a "reasonable probability" of the highest and best use coming to fruition, and not a "real possibility." See supra. In any case, we do not find the record supports this conclusion. Furthermore, such a finding is particularly unlikely in light of the trend both in the Corps' actions regarding permit applications and in the federal legislation since the 1980s toward a more vigorous protection of wetlands, both of which conclusions are supported by testimony given by several witnesses in this case. See infra text and note at n. 50.
[38] Additionally, the trial judge, by stating one of the reasons he was holding the District liable based on a valuation of the land as "developable" was because until the District accepted the permit no final determination regarding the location of the West Bank hurricane protection levee had been made, improperly implies the District had some duty to place its levee in a location beneficial to landowners and therefore, the District should be liable for the value the property would have had had the District been able to build its own levee along alignment D.
[39] In this regard, the testimony of Wilson P. Abraham, an owner of BDF Development Corporation, amply reflects that even the landowners realized their property was "worthless" at the time it was expropriated, as a result of the prior denial of BDF's permit application, a denial which the record shows is attributable to reasons other than the hurricane project in this case. See infra. During trial, Mr. Abraham was discussing the compromise alignment proposed by the landowners and implicitly rejected by the Corps when it rejected the parish's application for a permit along Alignment D. Mr. Abraham stated the landowners would have donated the land which would have remained unprotected under the compromise alignment (i.e. the land between the compromise alignment and alignment D) to the parish.

Q: Why would you agree to donate such valuable land?
A: If it's not usable, we're talking about the land on the other side, the new alignment, we had no use for it. We were paying taxes. It was absolutely useless. And it was just useless.
....
Q: Mr. Abraham, I believe you testified that without a levee to the rear of your property, there really was no way to develop it commercially or feasibly to do any type of revenue or put it to any use?
A: We were quite aware of that. You're right, that's why we got the study to build the levee. We knew we had to protect ourselves.... Without it you couldn't move.
Q: Without it, the property was worthless?
A: Was absolutely worthless. I might recall at that time there was no such a thing as impact studies and ecological studies when we bought the land. That happened unfortunately thereafter.
....
Q: [L]et's assume it's improbable that you could get a permit to build a levee on any alignment that would give you any substantial protection or protection to any substantial portion of the property okay. Assume that for a second that it's improbable that you could do that. So there is no probability of getting a levee to butt the back here [a levee along alignment D]. Now, if a levee is built though along the front along Highway 45, [alignment E] how does that prevent you from using the property if you couldn't use it without having a levee constructed on the rear of it to begin with?
A: You cannot get building permits.
Q: Would you have gotten building permits before the construction of the levee along Highway 45?
A: As long as the cease and desist order stuck, there, Jefferson Parish would not give a building permit, impossible.
Q: Well, so you really needed a levee across the rear of your property to do anything with it?
A: Yes sir; without a levee in the rear sir the property is absolutely useless.
[40] For example, the trial court stated that "the construction of the West Bank Hurricane Protection Levee along the Bayou des Families alignment would have allowed the Property to be developed as described in the VTN Master Plan, that is, primarily for the purpose of single family subdivisions," and that "prior to the decision of the West Jefferson Levee District to accept and act upon the permit for Alternate E, no final determination for the location of the West Bank Hurricane Protection Levee had been made." The trial court also concluded that "[o]nce the alignment for the West Bank Hurricane Protection Levee was finally decided, the land uses available to the Landowners for their property were determined."
[41] That the landowners' land would be developable with a hurricane protection levee built along alignment D does not meet the landowners' burden of proving the land was developable prior to the District's building of a levee along either alignment D or E.
[42] The federal district court decision was introduced into evidence by landowners.
[43] Mr. Abraham additionally testified as follows when asked to explain the language used in the Corps' denial of BDF's permit application in 1979:

A: Well, it says what we always thought it would be that they were procrastinating so that they would cooperate with the Jean Lafitte Park.
....
Q: During the course of the, some fifty-nine months between the time that your permit was submitted and the time that it was acted on in September of 1979, was the Jean Lafitte Park a hot topic of conversation?
A: At that time it was warm.
Q: And
A: It got hotter as they got involved with all of our land sitting there that could be used for free, yes sir.
Q: Did that become a significant factor as it related to the land use of your property?
A: Yes sir....
Q: Do you have any personal knowledge of the position of the National Park Service and the local governments with regard to the Jean Lafitte National Park and the effect of the land uses on your property with regard to the park?
A: Well, since the cease and desist around fifteen, sixteen, let's see '71 to '78, seven or eight years when it [the park] came into being, they vigorously resisted any idea of developing our area, Bayou des Families, vigorously at every meeting....
[44] In the letter, the Corps states: "The impacts of the levee project on the park, combined with other environmental impacts and the views previously expressed by other government agencies, cause us to believe that your request for a permit will be denied."
[45] Landowners make the additional argument that in order for the Corps to be able to offer the District a permit along alignment E in 1984, it was necessary that BDF's permit application for a levee along alignment D had to be denied in 1979. This does not change the fact, however, which is clear from the record, that BDF's permit application was denied for reasons unrelated to the project. Therefore, any devaluation of the property resulting from the requirement of permits for wetlands development mandated by the FWPCA or from the denial of BDF's permit cannot be attributed to the District.
[46] That Jean Lafitte Park continued to play a major role in the placement of any levee, be it BDF's or the District's, is also seen in the following statement made by Wilson P. Abraham, one of the owners of BDF Development Corp.

"[I]t was very apparent to me and everybody else that Jean Lafitte Park wanted our land, there was just no if ands and buts about it and so on several occasions I had made suggestions if they want the land we'll give it to them."
Additionally, Dr. Sherwood Gagliano, when reviewing the various grants and denials of permit applications by the Corps in the area surrounding landowners' property noted that the main difference between the granted permits and the denial of BDF's permit was that there was "no state or national park ... in the area of consideration of these permits." Dr. Gagliano also testified numerous times the ultimate decision by the Corps to reject the parish's application for alignment D and to only allow the levee to be built along alignment E was because of the park. "In my opinion there's no question that this [the park] was the major factor in deciding the alignment of that segment of the hurricane protection levee." He also testified that the parish would have obtained its permit for alignment D in 1984 "in the absence of the park."
[47] Although the compromise alignment was not mentioned in the draft EIS issued by the Corps, this was not because it was not considered in the final decision by the Corps but because it was not proposed until two months after the EIS was drafted.
[48] Dr. Baehr testified that Alignment E and the various other alignments which followed the line of alignment E in the reaches affecting landowners' property were created by the Corps. That alignment follows legally existing levees where they exist, in areas not affecting this property, and the wetland/non-wetland interface line in the area of the landowners' property, where no legally existing levee exists.
[49] See 16 U.S.C. § 1456(c); La.R.S. 49:214.21-49:214.41; La.Admin.Code 43:1.701-43:1.731.
[50] Since the passage of the FWPCA in 1972, obtaining a § 404 or § 10 permit from the Corps or successfully challenging the Corps' denial of a § 404 or § 10 permit has become increasingly difficult. In the intervening two decades, both the FWPCA (renamed the Clean Water Act in 1977) and the RHA have been strengthened by amendment, and the agencies involved in administration of the permitting process have, through Congressional action, executive branch orders and interpretation, and court decisions, had their powers and jurisdiction expanded. See, e.g., S. Kalen, Commerce to Conservation: The Call for a National Water Policy and the Evolution of Federal Jurisdiction Over Wetlands, 69 N.Dakota L.Rev. 873 (1993); Margaret N. Strand, Federal Wetlands Law, Wetlands Deskbook (1993); David H. Getches, Foreword, 60 Colo.L.Rev. 685 (1989); Michael C. Blumm and D. Bernard Zaleha, Federal Wetlands Protection Under the Clean Water Act: Regulatory Ambivalence, Intergovernmental Tension, and a Call for Reform, 60 Colo.L.Rev. 695 (1989); Mark C. Rouvalis, Restoration of Wetlands Under Section 404 of the Clean Water Act: An Analytical Synthesis of Statutory and Case Law Principles, 15 Boston College Env'tl Affairs L.Rev. 295 (1988).

In addition, since 1972, Congress has passed several other Acts which, as implemented and interpreted, have also had the effect of making permit acquisition or successful challenge of a permit denial less likely. See, e.g., Coastal Zone Management Act, 16 U.S.C. §§ 1451-1464, as amended by the Coastal Zone Act Reauthorization Amendments of 1990, Pub.L. No. 101-508, §§ 6201-6216, 104 Stat. 1388 (1990) (in effect, granting participating states "veto" power over Corps § 404 permit decisions (Louisiana, through the passage of the State and Local Coastal Resources Management Act in 1978, and its subsequent approval by the U.S. Secretary of Commerce in 1980, became a participating state with "pre-approval" authority over all Corps § 404 permit decisions in the Louisiana coastal zone. See La.R.S. 49:214.21-49:214.41; La.Admin.Code 43:1.701-43:1.731)); Coastal Barrier Resources Act, 16 U.S.C. §§ 3501-3510; Coastal Wetlands Planning, Protection and Restoration Act, 16 U.S.C. §§ 3951-3956; Emergency Wetlands Resource Act of 1986, 16 U.S.C. §§ 3901-3932; North American Wetlands Conservation Act, 16 U.S.C. §§ 4401-1413; Water Bank Act of 1980, 16 U.S.C. §§ 1301-1311, Pub.L. No. 96-182, 93 Stat. 1317 (amending the Water Bank Act in 1980 to broaden the definition of wetlands under that Act and authorizing increased payments to property owners for conservation of wetlands); Food Security Act of 1985, 16 U.S.C. §§ 3821-3824, Pub.L. No. 99-198, 99 Stat. 1507 (the "Swampbuster" program, removing incentives for persons to grow agricultural commodities on converted wetlands by withholding certain federal benefits).
The overall nationwide trend has thus been towards increasing protection of wetlands areas. This, of course, makes it less, not more, likely that the landowners herein would have been able, following the Corps' denial of their permit request in 1979, to obtain the necessary permits for development of their lands anytime thereafter.
[51] The Agreement states in part:

The Local Sponsor [the District] shall hold and save the Government free from all damages arising from the construction, operation, and maintenance of the Project, except for damages due to the fault or negligence of the Government or its contractors.
[52] In addition, Wilson P. Abraham, an owner of BDF, gave the following testimony:

Q: Have you received any offers to purchase any of your remaining property on the west side of Highway 45 in the last five or ten years?
A: No sir....
Q: Have you offered to sell it to anyone?
A: ... With a cease and desist, you couldn't do that. It's just absolutely impossible. That's selling property under false pretenses.... You wouldn't do it.
[53] Rule of Professional Conduct 1.5(a) provides in pertinent part that "[a] lawyer's fee shall be reasonable."
[54] This court's only function in this case is to decide the appropriate compensation due the landowners from a political subdivision of the State of Louisiana, namely, the West Jefferson Levee District, which expropriated the landowners' property for the construction of a hurricane protection levee. Louisiana constitutional and statutory provisions, as well as the jurisprudence of this court, are our guideposts. It goes without saying that it is not for this court to decide whether the denial of BDF's permit application by the Corps in 1979 was arbitrary or capricious or whether the Corps was legally obligated to build its own hurricane protection levee along the line of BDF's incomplete levee. Those issues were already decided against the landowners in Bayou Des Families Dev. Corp. v. United States Corps of Engineers, 541 F.Supp. 1025 (E.D.La. 1982), aff'd, 709 F.2d 713 (5th Cir.1983), cert. denied, 465 U.S. 1065, 104 S.Ct. 1413, 79 L.Ed.2d 739 (1984). Nor is there presented for decision by this court the merit of the landowners' claim against the federal government for any uncompensated regulatory taking resulting from the actions of the Corps of Engineers or the United States Department of the Interior over the past two decades. That matter is pending in the U.S. Claims Court. See Bayou Des Families Development Corp., Coast Quality Construction Corporation, and Betty Jane Perrin, Wife of/and Ronald J. Isaac v. The United States of America, No. 91-13151 (U.S.Cl.Ct., filed July 25, 1991).

Nonetheless, it is evident from the record that the landowners have lost the opportunity to develop their land and generate a return on their investment, not because of any action of the West Jefferson Levee District, as explained extensively herein, but rather as a result of federal governmental action. Although some of the actions of the federal government agencies involved were no doubt properly motivated, well-intentioned, and within the respective spheres of the decision making authority vested in those agencies, other actions were not so commendable and were perhaps beyond the appropriate concerns of those agencies. The most egregious example, cited supra, involves a letter from the Superintendent of Jean Lafitte Park to the regional director of the National Park Service, which, as interpreted by Dr. Sherwood Gagliano, indicated the park superintendent believed he could keep the developers from developing their property, and thus out of the park protection zone, through use of the § 404 permit process, and that by doing so, he could keep the value of the property low for purposes of the Park Service's acquisition of it at a later date.
[1] The argument of this dissenting justice is not that the property was worth its full "permitted" value since a possibility existed of obtaining a permit; rather, it is that the property was worth more than its "unpermitted" value with no opportunity of obtaining a permit. In other words, the proper value of the property is the "unpermitted" value plus any premium a reasonable buyer would be willing to pay under the circumstances that existed at the time of expropriation.
[2] L. Orgel, Valuation Under the Law of Eminent Domain (1953).
[3] Nichols, The Law of Eminent Domain (1990).
[4] M. Dakin & M. Klein, Eminent Domain in Louisiana (1970, Supp.1978).
[5] See also Recreation & Park Com'n v. Drago, 247 So.2d 908, 910-911 (La.App. 1 Cir.1971), in which the First Circuit, after discussing the fact that the terms "reasonably prospective," "reasonably possible," "reasonably probable," or "reasonably certain" "seem to be used interchangeably," decided upon "reasonable possibility" as the appropriate standard to employ.
[6] Pursuant to the Tucker Act, 28 U.S.C. Section 1491, the Court of Claims enjoys exclusive jurisdiction over all takings claims against the United States. Broughton Lumber Co. v. Yeutter, 939 F.2d 1547 (Fed.Cir.1991). The Federal Circuit Court of Appeals entertains appellate jurisdiction over the Court of Claims. See Broughton, supra; Loveladies Harbor, Inc. v. United States, 28 F.3d 1171 (Fed.Cir.1994). It would be appropriate for this Court to accord the recent pronouncements of the Federal Circuit, which now solely enjoys the responsibility of reviewing federal takings claims, greater weight than the somewhat dated view of the United States Fifth Circuit Court of Appeals. See Land, 62.50 Acres of Land, supra.
[7] According to Black's Law Dictionary, the term "appropriation" is customarily used "in contra-distinction to `taking'" or expropriation. Black's Law Dictionary, P. 131 (4th ed. 1968).
[8] In the discussion of their application of this statute, the Court observes that "the requirement the landowner be compensated to the full extent of his loss is statutory ... and is not constitutionally based." Majority Opinion, P. 1276 n 33. As the discussion in the preceding section regarding the application of Article I, Section 4 to expropriations as opposed to appropriations reveals, this view is erroneous.
[9] Remember, the Jefferson Parish governing body, which incidentally was fully in charge of the levee alignment selection until it turned responsibility over to the Levee District, had been fighting on the side of the landowners for years; the Corps of Engineers itself had, until just before the decision was made, been publicly debating the merits and demerits of alternate plans, including Alignment D; and all of this long succeeded the adoption of the Clean Water Act in 1972, the creation of Lafitte Park, and the concomitant debate over the limits of the Park Protection Zone.
[10] I note that while Louisiana law should support such a valuation upon merely a reasonable possibility of such use, nonetheless that reasonable possibility must be real, otherwise the law would invite valuation based upon mere speculation, which is not and should not be permitted.